[No. 85535-8.   En Banc.]
Argued October 20, 2011.     Decided August 9, 2012.

LEO MACIAS ET AL., *Petitioners*, v. SABERHAGEN HOLDINGS, INC., ET AL., *Respondents*.

*John W. Phillips* and *John M. Geyman* (of *Phillips Law Group PLLC*) and *Matthew P. Bergman* and *Brian F. Ladenburg* (of *Bergman Draper Ladenburg PLLC*), for petitioners.

*Paul J. Kundtz, Wendy E. Lyon,* and *Daniel J. Gunter* (of *Riddell Williams PS*); *Kevin C. Baumgardner* and *Anthony Todaro* (of Corr Cronin *Michelson Baumgardner & Preece LLP*); *Timothy L. Ashcraft* and *Randy J. Aliment* (of *Williams Kastner & Gibbs*); *Robert J. Sexton*; and *Timothy K. Thorson* (of *Carney Badley Spellman PS*), for respondents.

*Brian T. Hodges* and *Deborah J. La Fetra* on behalf of Pacific Legal Foundation, amicus curiae.

*Bryan P. Harnetiaux* and *George M. Ahrend* on behalf of Washington State Association for Justice Foundation, amicus curiae.

*Mark Behrens, Cary Silverman, James O. Neet Jr., Quentin Riegel, Robin S. Conrad, Kate C. Todd, Sean McMurrough, Lynda Mounts,* and *Daniel Evans* on behalf of National Association of Manufacturers, Coalition for Litigation Justice, U.S. Chambers of Commerce, Property Casualty Insurers Association of America, American Insurance Association, and American Chemistry Council, amici curiae.

¶1 MADSEN, C.J. — Plaintiff Leo Macias worked as a tool keeper in a shipyard and his job required that he maintain respirators that other workers wore to filter out dangerous

contaminants. Mr. Macias and his wife Patricia Macias brought this suit against the respirator manufacturers, alleging that cleaning and maintaining the respirators exposed Mr. Macias to asbestos, causing him to develop mesothelioma. The plaintiffs claim that the manufacturers owed a duty to warn Mr. Macias of the danger that he could be exposed to harmful asbestos dust when he cleaned and maintained the respirators. The respirator manufacturers moved for summary judgment on the ground that as a matter of law under *Simonetta v. Viad Corp.*, 165 Wn.2d 341, 197 P.3d 127 (2008), and *Braaten v. Saberhagen Holdings*, 165 Wn.2d 373, 198 P.3d 493 (2008), they owed no duty to warn. The trial court denied the motion.

¶2 The Court of Appeals reversed, holding that under *Simonetta* and *Braaten* the defendants did not owe a duty to warn because they did not manufacture the asbestos-containing products that were the source of the asbestos to which Mr. Macias was exposed. We reverse the Court of Appeals.

¶3 In *Simonetta* and *Braaten* we held that generally a manufacturer does not have a duty to warn of the dangers inherent in a product that it does not manufacture, sell, or supply. However, *Simonetta* and *Braaten* do not control the present case because the duty at issue is to warn of the danger of asbestos exposure inherent in the use and maintenance of the defendant manufacturers' *own* products, the respirators.

## FACTS

¶4 From 1978 to 2004, Mr. Macias worked as a tool keeper at Todd Shipyards in Seattle. His job was to supply shipyard workers with tools and equipment that they used in their work at the shipyard, among which were respirators manufactured by defendants American Optical Corporation, Mine Safety Appliances Company, and North America Safety Products USA (hereafter manufacturers or respirator manufacturers).

¶5 When they completed their shifts, shipyard workers, such as pipefitters and welders, returned the respirators to the tool room where Mr. Macias worked. These workers wore the respirators to filter various contaminants from the air they breathed, including asbestos, welding fumes, paint fumes, and dust. Different filter cartridges were used for the different contaminants.

¶6 Mr. Macias's duties included cleaning the respirators and replacing their filter cartridges. When they were returned to him, he would throw the respirators, many of which had a dusty film on them, into a nearby basket. Sometimes the respirators were bounced off a nearby window, which caused "little poofs of dust." 1 Clerk's Papers (CP) at 127. The same thing would occur when the basket was nearly full and another respirator was thrown into it. When the basket was full, Macias would disassemble the respirators, causing "dust, sand, dirt" to "just fly out." *Id.* at 128. Macias threw away the dirty filters and then scrubbed the respirators' reusable parts with a nylon brush, rinsed them in a sink, and stacked them in an oven to dry. Mr. Macias handled hundreds of used respirators during busy periods.

¶7 In May 2008, Mr. Macias was diagnosed with mesothelioma, a deadly type of cancer associated with asbestos exposure.[1] In June 2008, Mr. and Mrs. Macias filed this personal injury suit against the manufacturers, asserting causes of action in negligence and product liability. Mr. Macias maintained that he did not know he was at risk from exposure to the asbestos dust coating the used respirators and filters and that he never saw a warning to take precautions when handling and maintaining them, such as wearing a respirator himself or wetting the respirators before disassembling them. He testified that if he had been warned, he would have taken precautions. The plaintiffs presented evidence that the respirator manufacturers knew

---

[1] Mr. Macias died from the disease in June 2010, while this case was pending.

that inhalation of asbestos was potentially harmful to people and that the respirators would have to be routinely cleaned and the filter cartridges replaced. The plaintiffs pointed out that in an instruction manual one of the defendants specifically warned respirator *users* that the air-purifying elements had to be replaced in a safe area with uncontaminated, breathable air.

¶8 The defendants moved for summary judgment. They pointed out that they did not manufacture the products containing the asbestos to which Mr. Macias was exposed and argued that as a matter of law under *Simonetta* and *Braaten* they owed no duty to warn Mr. Macias about the dangers associated with asbestos in another company's product. The trial court denied the motion, finding *Simonetta* and *Braaten* distinguishable.

¶9 The manufacturers sought interlocutory discretionary review, which the Court of Appeals granted. The Court of Appeals agreed with the manufacturers that our decisions in *Simonetta* and *Braaten* foreclose the plaintiffs' failure to warn claims and reversed the trial court's denial of summary judgment. The Court of Appeals determined that because the defendant manufacturers were not in the chain of distribution of the asbestos-containing products that were the source of the asbestos to which Mr. Macias was exposed, they had no duty to warn of the hazards of exposure to asbestos. *Macias v. Mine Safety Appliances Co.*, 158 Wn. App. 931, 244 P.3d 978 (2010). Mr. Macias sought discretionary review of the Court of Appeals' opinion, which we granted.

ANALYSIS

¶10 A trial court's denial of summary judgment is reviewed de novo, with the appellate court engaging in the same inquiry as the trial court. *Aba Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006); *Tiffany Family Trust Corp. v. City of Kent*, 155 Wn.2d 225, 230, 119 P.3d 325

(2005). Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." CR 56(c).

¶11 The plaintiffs asserted failure to warn common law product liability and negligence claims and a failure to warn claim under the Washington product liability act (WPLA or Act), chapter 7.72 RCW. The Court of Appeals addressed each of these causes of action in its opinion.

¶12 However, Mr. Macias worked as a tool keeper from 1978 to 2004. The WPLA governs all product liability claims arising on or after July 26, 1981. RCW 4.22.920(1). In a case where "substantially all" of the injury-producing events exposing a shipyard worker to asbestos occurred prior to the WPLA's effective date, the Court of Appeals held that the product liability claim did not "arise" after the effective date. *Koker v. Armstrong Cork, Inc.*, 60 Wn. App. 466, 472, 804 P.2d 659 (1991). The same rule was applied in *Krivanek v. Fibreboard Corp.*, 72 Wn. App. 632, 865 P.2d 527 (1993), where substantially all of plaintiff's exposure to asbestos occurred prior to the WPLA's adoption, but he was diagnosed with the injury—mesothelioma—after its adoption. The court held that the WPLA did not apply because the harm resulted from exposure and substantially all of the injury-producing events occurred before the effective date of the Act. *Id.* at 635; *see also Viereck v. Fibreboard Corp.*, 81 Wn. App. 579, 584-85, 915 P.2d 581 (1996) (because "substantially all the events producing" mesothelioma from asbestos exposure occurred before 1981, the WPLA was not applicable). Likewise, in *Braaten*, we noted that the exposure to asbestos products "substantially occurred before the enactment" of the WPLA. *Braaten*, 165 Wn.2d at 383 n.4. We therefore decided the case under common law product liability and negligence law.

¶13 Here, in contrast, the exposure to asbestos substantially occurred after the effective date of the WPLA. As noted, Mr. Macias was allegedly exposed to asbestos from

1978 to 2004.[2] In accord with *Koker, Viereck,* and *Braaten,* we hold that when substantially all of the exposure to injury-causing asbestos occurs on and after July 26, 1981, the WPLA applies.

¶14 The WPLA is the exclusive remedy for product liability claims. *Potter v. Wash. State Patrol,* 165 Wn.2d 67, 87, 196 P.3d 691 (2008). It supplants all common law claims or actions based on harm caused by a product. *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.,* 122 Wn.2d 299, 323, 858 P.2d 1054 (1993); *Wash. Water Power Co. v. Graybar Elec. Co.,* 112 Wn.2d 847, 853, 774 P.2d 1199, 779 P.2d 697 (1989). Insofar as a negligence claim is product-based, the negligence theory is subsumed under the WPLA product liability claim. *Hue v. Farmboy Spray Co.,* 127 Wn.2d 67, 87, 896 P.2d 682 (1995); *Wash. State Physicians Ins. Exch. & Ass'n,* 122 Wn.2d at 323; *Wash. Water Power,* 112 Wn.2d at 853. Thus, the only claim before us is a claim under the WPLA.

¶15 However, the Act provides that "[t]he previously existing applicable law of this state on product liability is modified only to the extent set forth in" the Act. RCW 7.72.020(1). Moreover, with respect to failure to warn claims in particular, we have concluded that the legislature intended that the Act's provisions themselves carry forward principles that we previously recognized under the common law.

¶16 Specifically, RCW 7.72.030 governs claims that a product manufacturer is liable in that the product is not reasonably safe because the manufacturer failed to provide adequate warnings or instructions. Strict liability principles apply to both defective design and failure to warn cases. RCW 7.72.030(1), (2); *see Falk v. Keene Corp.,* 113

---

[2] The record indicates that Macias maintained and cleaned respirators manufactured by the Mine Safety Appliances Company and North America Safety Products USA only after June 1981. The WPLA clearly governs the claims against these defendants. With respect to American Optical Corporation, the WPLA applies, as explained, because substantially all of Mr. Macias's exposure to asbestos occurred after the effective date of the Act.

Wn.2d 645, 782 P.2d 974 (1989) (design defects); *Ayers ex rel. Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 762-63, 818 P.2d 1337 (1991) (failure to warn). These are the strict liability principles that were defined by this court under the common law prior to the WPLA. *Falk*, 113 Wn.2d at 650-54; *see Couch v. Mine Safety Appliances Co.*, 107 Wn.2d 232, 728 P.2d 585 (1986); *Seattle-First Nat'l Bank v. Tabert*, 86 Wn.2d 145, 542 P.2d 774 (1975). Foreseeability is not an element of the cause of action. *Ayers*, 117 Wn.2d at 760-62.

¶17 Accordingly, although *Simonetta* and *Braaten* were not decided under the WPLA, they are still relevant to the extent they reflect the same common law principles that remain applicable under the WPLA and are reflected in the strict liability-based provisions of the Act.

¶18 The only issue before us is whether as a matter of law the manufacturers are entitled to summary judgment on the basis that they had no duty to warn of the danger of exposure to asbestos when their respirators were cleaned and maintained for reuse because these manufacturers were not in the chain of distribution of the asbestos-containing products themselves. The trial court held they are not entitled to summary judgment on this basis. The manufacturers contend, however, and the Court of Appeals agreed, that under *Simonetta* and *Braaten* the manufacturers cannot be found liable when the respirators as manufactured did not themselves contain asbestos, i.e., they maintain that any injury was actually due to the asbestos-containing products manufactured by others.

¶19 In *Simonetta* and *Braaten* we held that in general, to find strict liability in a product liability case, the manufacturer must be in the chain of distribution. This is a rule that had long been acknowledged in this state under the common law. Upon adoption of the *Restatement (Second) of Torts* § 402A (1965) in *Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 531-32, 452 P.2d 729 (1969), this court recognized that the section applies to "those in the chain of

distribution," i.e., a "manufacturer, . . . dealer or distributor" of the product. *Seattle-First Nat'l Bank*, 86 Wn.2d at 148 (emphasis omitted); *see also Zamora v. Mobil Oil Corp.*, 104 Wn.2d 199, 206-07, 704 P.2d 584 (1985).

¶20 Nothing in the WPLA modifies the rule that in general, a manufacturer must be in the chain of distribution for strict product liability and thus the rule continues in force. It is, however, a general rule, as we expressly explained in *Braaten*. We first noted that

> [o]ur decision in *Simonetta* is in accord with the majority rule nationwide: a "manufacturer's duty to warn is restricted to warnings based on the characteristics of the manufacturer's own products"; "[t]he law *generally* does not require a manufacturer to study and analyze the products of others and warn users of the risks of those products." 3 AMERICAN LAW OF PRODUCTS LIABILITY 3D § 32:9 (John D. Hodson & Richard E. Kay eds. 2004); 63A AM. JUR. 2D *Products Liability* § 1127 (1997).

*Braaten*, 165 Wn.2d at 385 (emphasis added). However, we went on to explain that this "general rule does not apply to a manufacturer who incorporates a defective component into its finished product," noting that this is sometimes called assembler liability. *Id.* at n.7. We explained that the justification for assembler's liability "is that the assembler derives an economic benefit from the sale of the product incorporating the defective component and has the ability to test and inspect the component when it is within the assembler's possession, and by including the component in its finished product represents to the consumer and ultimate user that the component is safe." *Id.* Assembler liability is not implicated here because the respirator manufacturers did not incorporate defective asbestos components into their finished products, i.e., they did not assemble any asbestos products into the respirators during manufacture.

¶21 We also noted in *Braaten* that there is another exception to the general rule: "In addition, there are some cases where the combination of two sound products creates

a dangerous condition, and both manufacturers have a duty to warn." *Id.* The plaintiffs have argued this exception in the alternative; however, it is not implicated, either. This second exception applies where the combination of two sound products creates a dangerous condition and both manufacturers have a duty to warn. 3 AMERICAN LAW OF PRODUCTS LIABILITY 3D, *supra*, § 32:9; *see Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 298, 591 N.E.2d 222, (1992).

¶22 As an example, in *Teagle v. Fischer & Porter Co.*, 89 Wn.2d 149, 155, 570 P.2d 438 (1977), the defendant manufacturer produced a "flowrater" for measuring liquids. The plaintiff's employer purchased a flowrater rated at 440 p.s.i. for measuring liquids in the production of liquid fertilizers. Although the manufacturer knew when it sold the device that protective measures were needed for pressures above 50 p.s.i., it did not warn of the hazard of using the flowrater at higher pressures. In addition, although the manufacturer recommended to its distributors that Buna "O-rings" should be used when measuring ammonia, it did not warn that use of other O-rings with ammonia entailed danger of the O-ring hardening and disintegrating within a short time. Anhydrous ammonia was running through the flowrater in which a Viton O-ring had been installed at 175 p.s.i. when it exploded, injuring the plaintiff.

¶23 Our principal holding was that in terms of the reasonable expectations of the ordinary consumer (a test the court concluded applied in a failure to warn common law strict liability case as it did in a design defect case), a reasonable person would conclude that the unguarded flowrater was not reasonably safe when sold without a warning.

¶24 We also noted, however, that although the manufacturer knew that Viton O-rings were incompatible with ammonia, it did not warn of the danger. "The lack of this warning, by itself, would render the flowrater unsafe." *Teagle*, 89 Wn.2d at 156. This part of the analysis demon-

strates the second exception. Both the flowrater and the Viton O-ring were sound products that could be safely used. But when these products were used in combination, they created a hazard, and it was one of which the manufacturer was aware. Thus, in *Teagle*, the manufacturer's product was used in conjunction with another product, with the two products together creating the hazardous condition.

¶25 The same is not true here. The respirators were not *used* in combination with asbestos. The respirators' purpose was to filter contaminants from the air. Asbestos, or an asbestos-containing product, was not combined with the respirators to filter the air. Rather, the asbestos itself was filtered from the air.

¶26 Although neither of the exceptions is implicated in the present case, it must be remembered that the general rule stated in *Simonetta* and *Braaten* is just this, a general rule to which there are exceptions. Further, *Simonetta* and *Braaten* did not establish new law narrowing the class of manufacturers who may have a duty to warn of inherent dangers in products. Both cases rest on settled principles. They do not establish any new, absolute rule limiting liability.

¶27 But as the plaintiffs point out, the Court of Appeals treated *Simonetta* and *Braaten* as establishing virtually an absolute rule: if the source of the hazardous substance was not the manufacturers' own product, no duty can arise. The plaintiffs argued, in responding to the defendants' motions for summary judgment, that their claims are fundamentally different from those in *Simonetta* and *Braaten* because here the "focus of [the] claims is on the respirator itself . . . . [I]t failed to include adequate warnings and instructions regarding the safe use, handling, maintenance, and cleaning of the respirator." 2 CP at 295. Plaintiffs stated that their claims "rest squarely on the respirator product in and of itself, and specifically on the inadequate warnings and instructions of the respirator product, without reference to any other manufacturer's products." *Id.*

¶28 We agree with the plaintiffs. In *Simonetta* and *Braaten*, the defendants were manufacturers of an evaporator, pumps, and valves that were installed on Navy ships. *Simonetta*, 165 Wn.2d at 346; *Braaten*, 165 Wn.2d at 381. After these products were installed they were encased in asbestos insulating materials that the Navy applied to the equipment on its ships. *Simonetta*, 165 Wn.2d at 346; *Braaten*, 165 Wn.2d at 381. When the defendants' products were subjected to routine maintenance or replacement parts were installed, workers broke through the insulation in order to service the equipment or replace parts. *Simonetta*, 165 Wn.2d at 346; *Braaten*, 165 Wn.2d at 381. The plaintiffs were exposed to asbestos during such maintenance and developed lung cancer and mesothelioma. They sued the manufacturers, arguing that the manufacturers had a duty to warn of the danger of exposure to asbestos that occurred during maintenance of their products.

¶29 Applying the common law, we held that the manufacturers were not in the chain of distribution of the asbestos insulating products and therefore had no duty to warn of the danger of exposure to asbestos during servicing, and it makes no difference whether the manufacturers knew that their products would be used in conjunction with asbestos insulation. *Simonetta*, 165 Wn.2d at 352-55 (negligence), 355, 357-58 (strict liability); *Braaten*, 165 Wn.2d at 385, 389-90 (strict liability), 390-91 (negligence).

¶30 Critically, for present purposes, the products involved in the *Simonetta* and *Braaten* cases did not require that asbestos be used in conjunction with their products, nor were they specifically designed to be used with asbestos. Nor were those products designed as equipment that by its very nature would necessarily involve exposure to asbestos.

¶31 Unlike the valves, pumps, and evaporator in *Simonetta* and *Braaten*, which only happened to be insulated by asbestos products because the Navy chose to insulate the equipment on its ships with asbestos products, the respirators at issue here were specifically designed to and in-

tended to filter contaminants from the air breathed by the wearer, including asbestos, welding fumes, paint fumes, and dust. Indeed, filtering out such contaminants, including asbestos, is the exact reason that the respirators were used; removing asbestos and other contaminants was the very function for which the respirators were intended. They were also designed to be reused in contaminated environments, and thus the contaminants removed from the air and present in concentrated amounts in the respirators had to be removed so the respirator could be reused. Integral to reuse, the respirators had to be safely cleaned of the contaminants from the last use, and prior to this cleaning, they had to be safely handled.

¶32 In short, the very purpose of the respirators would, of necessity, lead to high concentrations of asbestos (and/or other contaminants) in them, and in order to reuse them as they were intended to be reused, this asbestos had to be removed.

¶33 Viewing the facts and the reasonable inferences from the facts in the plaintiffs' favor, as we must, the respirator manufacturers manufactured the very products that posed the risk to Mr. Macias of asbestos exposure. They were clearly in the chain of distribution of these products—respirators that necessarily and purposefully accumulated asbestos in them when they functioned exactly as they were planned to function. It does not matter that the respirator manufacturers were not in the chain of distribution of products containing asbestos when manufactured.

¶34 By comparison, if, as a result of a failure to instruct on how to properly use a respirator, a wearer of the device was exposed to the very contaminants that the respirator would have filtered out had the wearer been properly advised on use, there would be no doubt that the respirator manufacturer would be found to be in the chain of distribution of the allegedly unsafe product. There is no meaningful difference in this case. Cleaning the respirators was

required for their reuse. Whether during actual use or preparation for reuse, the inherent danger arises because of the nature and use of the respirator itself.[3]

¶35 In summary, this case comes within the general rule that a manufacturer in the chain of distribution is subject to liability for failure to warn of the hazards associated with use of its own products. *Simonetta* and *Braaten* do not control because unlike in those cases, where the manufacturers' products did not, in and of themselves, pose any *inherent* danger of exposure to asbestos, here when the products were used exactly as intended and cleaned for reuse exactly as intended they *inherently* and invariably posed the danger of exposure to asbestos. Thus, the manufacturers of the respirators were not entitled to summary judgment on the issue of whether, under *Simonetta* and *Braaten*, they are proper defendants for purposes of the plaintiffs' failure to warn claims.[4]

---

[3] The manufacturers have argued that the respirators were no different from hammers, tarps, and other tools and equipment used around the shipyards and returned for cleaning. While all of these products might have come into contact with asbestos or other hazardous materials, there is a difference. A respirator that is specifically designed to, and does, filter harmful contaminants from the air will pose a hazard because its very purpose is to trap harmful contaminants; the product itself poses a hazard if it works as intended to prevent exposure to hazardous substances. The other products mentioned by the manufacturers come into contact with hazardous particles because by happenstance they are used around asbestos. They are not specifically designed to prevent exposure to hazardous substances. The respirators come into contact with asbestos because that is what they are intended to do.

[4] The dissent contends that the present case is indistinguishable from *Simonetta* and *Braaten*, asserting that the products in those cases required insulation and the only insulation meeting Navy specifications contained asbestos. But the products in *Simonetta* and *Braaten* were not designed for or intended for use with asbestos, but only came into contact with asbestos because that was the purchaser-Navy's choice to use as shipwide insulation. The respirators in the present case, in contrast, are products specifically designed and intended to filter asbestos and other contaminants. When used exactly as designed and intended, the respirators invariably and necessarily involve exposure to the specific contaminants for which the respirator filters are designed. The products themselves involve risk of asbestos exposure when they are used exactly for the purpose for which they were manufactured and sold. There is no such inherent, necessarily existent risk of exposure in use of products that, at the ultimate choice of the purchaser, are coated with asbestos-containing insulation.

■ ¶36 The manufacturers argue, however, that the intended purpose of the filters goes to foreseeability and thus should not lead to a duty in this case because foreseeability is not an element of a failure to warn claim. *See Simonetta*, 165 Wn.2d at 349 n.4 (foreseeability of injury does not, in and of itself, create a duty to warn); *see also Ayers*, 117 Wn.2d at 760-62. But considering foreseeability in the context of determining whether the product is unsafe without adequate warnings and instructions is a different matter from considering foreseeability of injury to establish that a duty is owed.

¶37 Under the WPLA, a failure to warn claim has a risk-benefit analysis basis, as set out in RCW 7.72.030:

(1) A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided.

. . . .

(b) A product is not reasonably safe because adequate warnings or instructions were not provided with the product, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate and the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate.

¶38 At the same time, the WPLA directs that in addition to this risk-utility analysis, and as was true of our common law prior to the act, "[i]n determining whether a product

---

The dissent says, though, that just as the manufacturers in *Simonetta* and *Braaten* were not liable for harm from asbestos in another manufacturer's product, the respirator manufacturers should not face liability for asbestos when they did not manufacture the products that were the source of the asbestos. The dissent cites *Simonetta*, 165 Wn.2d at 347. Dissent at 423-24. This citation is to a quote from the Court of Appeals' opinion in the case, not this court's decision that reversed the Court of Appeals. A second citation is the dissent in *Simonetta*. Dissent at 424.

was not reasonably safe under this section, the trier of fact shall consider whether the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer." RCW 7.72.030(3). Thus, a consumer expectations standard is also a relevant part of the WPLA analysis.

¶39 Under the WPLA, foreseeability is not an element of a failure to warn claim. However, when applying the provisions of the WPLA one must consider the actual use of the product when deciding whether it is unreasonably unsafe— and this is true when that use is predictably to occur in the future in specific, foreseeable circumstances. Imagine a kitchen blender sitting in its packing box or a new table saw with a saw blade attached. Neither poses much of a hazard simply sitting unused. It is only when the product is put to use at some point in the future that the hazards inherent in swiftly turning blades exist. Or imagine a new gas stove. It will predictably be used with natural gas. The hazard exists only in the future when the product is fueled by natural gas.

¶40 That these products are likely to be used in the future and the predictability of the future hazards posed during actual use does not involve forbidden considerations of foreseeability of harm as defining duty. Rather, future use and predictability of hazards when the product is used as intended involve considerations of whether the product itself is unreasonably unsafe. In fact, *every* product will be put to use at some time in the future after its manufacture, and at that point the hazards that will predictably be involved in its use will become manifest.

¶41 Here, the respirators are designed to prevent human exposure to hazardous substances, and this means they will be used in an environment where hazardous materials are or are likely to be present and these materials will be trapped in the filters of the respirators. The respirators are designed for and consumers use them for preventing exposure to such hazardous materials, including harmful vapors and asbestos.

¶42 In summary, the fact that predictably, or foreseeably, the respirators will be used to filter asbestos does not involve improper consideration of foreseeability of injury to impose a duty. Rather, it is a matter of considering whether the product might be unreasonably unsafe in the absence of adequate warnings and, as is always true in product liability cases, the use to which the product will be put is always a part of this determination.

¶43 As noted, the risk-benefit analysis under the WPLA includes consideration of whether the "manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate." RCW 7.72-.030(1)(b). This factor includes the practical question of whether an adequate warning could have been provided. It also implicates the question of whether the manufacturer was in a position to provide adequate warnings. Generally speaking, there is no more suitable party to warn of the dangers inherent in using a safety product safely than the manufacturers who designed the product and who are best positioned to know how the product works and how it must be safely used and maintained. Imposing liability on safety product manufacturers can be an incentive to these manufacturers to provide adequate warnings that are necessary to protect people from the very hazards their products are designed to protect against. A false sense of safety can be worse than none in light of injuries that hazardous substances can cause.[5]

---

[5] Of course, Congress and our state legislature have authority to implement public policy through laws regarding the ability to sue when safety equipment is involved. Whether any such laws exist, along with the possibility of administrative regulations drafted under delegated authority, is not the focus of this interlocutory review of whether the trial court properly denied summary judgment to the manufacturers on the issue of whether *Simonetta* and *Braaten* dictate that no duty to warn was owed.

The dissent believes that the safety purpose of respirators weigh against liability in this case. Dissent at 426. As stated, the legislature has authority to immunize manufacturers of safety equipment from liability, but they have not implemented such public policy in the WPLA itself. If there is any such policy set out elsewhere by the legislature or Congress, as noted, it is not before us.

■ ¶44 We reiterate, however, that the only issue we decide is whether *Simonetta* and *Braaten* preclude the plaintiffs' failure to warn claims as a matter of law. Put a little differently, the issue here is whether the plaintiffs have correctly identified the manufacturer of the product that allegedly caused the injury, a requirement in every product liability case. *Lockwood v. AC&S, Inc.*, 109 Wn.2d 235, 245, 744 P.2d 605 (1987). We recognize that the briefing before us has gone well beyond the issue whether under *Simonetta* and *Braaten* the respirator manufacturers are appropriate defendants for a cause of action based on failure to warn. For example, there is discussion about whether a new exception to the general rule that the manufacturer must be in the chain of distribution should be recognized in the case of safety products. There is also briefing on the ultimate question: whether these manufacturers had a duty to warn under the WPLA's risk-utility test or its consumer expectations test, or both.

¶45 We do not address any issue beyond that decided on summary judgment, i.e., whether *Simonetta* and *Braaten* foreclose the plaintiffs' failure to warn claims as a matter of law because the respirator manufacturers did not manufacture the products that were the source of the asbestos that collected on and in the respirators. Other questions, for example, whether the danger was so obvious that no warnings were required, may arise, *see Anderson v. Weslo, Inc.*, 79 Wn. App. 829, 840, 906 P.2d 336 (1995), and we will not foreclose the parties from pursuing whatever arguments may remain to them on remand. It is for the trial court to consider in the first instance any additional issues the parties raise in connection with whether the respirator manufacturers had a duty to warn of hazards associated with the use and maintenance of the respirators.

¶46 In short, *Simonetta* and *Braaten* do not control, as explained. There are general similarities, it is true. All of these cases involve failure-to-warn duties of product manufacturers and harm resulting from exposure to asbestos. All

implicate the general rule that a manufacturer outside the chain of distribution is generally not liable for failing to warn of dangers associated with a product. But in significant ways, the cases are distinguishable. In *Simonetta* and *Braaten*, the manufacturers did not manufacture products that inherently involved the danger of exposure to asbestos. Here, the respirator manufacturers manufactured products that inherently involved the danger of exposure to asbestos when the products were used exactly as intended and for the purpose for which they were intended.

¶47 It is important that *Simonetta* and *Braaten* not be overread to result in new rules for product manufacturers. The *Simonetta* and *Braaten* cases were explicitly decided on the basis of settled tort principles, and neither introduced new law. These cases did not introduce for the first time the notion that a defendant in a product liability case generally can be liable only if in the chain of distribution. That principle came into our law with the adoption of section 402A of the *Restatement (Second) of Torts*, as explained above.

## CONCLUSION

¶48 The trial court properly denied the manufacturers' motions for summary judgment. *Simonetta* and *Braaten* do not control this case because the circumstances are entirely different. Here, the respirator manufacturers' own products presented the inherent danger of exposure to asbestos when used as intended, while in *Simonetta* and *Braaten* the manufacturers' products were equipment used on Navy ships and posed no inherent danger of exposure to asbestos. It was only when the Navy applied asbestos insulation products to the equipment that any hazard was created at all, and it was not a hazard created by the manufacturers nor was it a hazard that necessarily occurred when their products functioned as intended.

¶49 The chain-of-distribution requirement has long been a part of this state's product liability law. Further, the

requirement is not an absolute rule. This court has previously applied one of two generally recognized exceptions to the chain-of-distribution rule, i.e., when two sound products combine to create an unreasonably unsafe condition. While the chain-of-distribution requirement is undoubtedly the general rule, and an important one at that, it is not absolute.

¶50 *Simonetta* and *Braaten* did not alter the common law principles, and of course neither alters the law under the WPLA. In the present case, the holdings of these cases simply do not apply. Here, the record as it is presented to us supports the plaintiffs' theory that the respirator manufacturers' own products, when used as intended, including cleaning for reuse, were inherently dangerous in the absence of adequate warnings. This is, however, the ultimate question that must await further proceedings on remand of this case.

¶51 The Court of Appeals is reversed. The trial court properly denied summary judgment. This case is remanded for further proceedings.

CHAMBERS, FAIRHURST, STEPHENS, and WIGGINS, JJ., concur.

¶52 J.M. JOHNSON, J. (dissenting) — The majority is able to distinguish this case from *Simonetta* and *Braaten* by subtly recasting the holdings of both cases while echoing the reasoning of the *Simonetta/Braaten* dissents. *See Simonetta v. Viad Corp.*, 165 Wn.2d 341, 197 P.3d 127 (2008); *Braaten v. Saberhagen Holdings*, 165 Wn.2d 373, 198 P.3d 493 (2008). According to the majority, "*Simonetta* and *Braaten* do not control the present case because the duty at issue is to warn of the danger of asbestos exposure inherent in the use and maintenance of the defendant manufacturers' *own* products." Majority at 405. Yet, this was *exactly* the issue we confronted in *Simonetta* and *Braaten*. In both cases, the plaintiff was brought into contact with asbestos through

the necessary maintenance of the defendants' *own* products. We nevertheless held the defendant manufacturers could not be liable because they were not in the chain of distribution of the asbestos-containing products, stating that "a manufacturer has no duty . . . to warn of the dangers of exposure to asbestos in products it did not manufacture and for which the manufacturer was not in the chain of distribution." *Braaten*, 165 Wn.2d at 398. This was so even though the danger of asbestos exposure was inherent in the use of the product at issue. *See Simonetta*, 165 Wn.2d at 350. The majority's position that "[i]t does not matter that the respirator manufacturers were not in the chain of distribution of products containing asbestos" is irreconcilable with this precedent. Majority at 415.

¶53 The majority adopts the plaintiffs' view that their claims " 'rest squarely on the respirator product in and of itself . . . without reference to any other manufacturer's products.' " *Id.* at 413 (quoting 2 Clerk's Papers at 295). But, Leo Macias was not harmed by the respirators themselves, but by outside asbestos that came in contact with the respirators. Had asbestos from the shipyard not gathered upon the respirators Macias later cleaned, he would not have been injured at all. Thus, to state a claim of injury, Macias necessarily must reference another manufacturer's asbestos-containing product.

¶54 The majority betrays its infidelity to *Simonetta* and *Braaten* by resting its holding on a distinction that does not exist: that the products in *Simonetta* and *Braaten* were not "specifically designed to be used with asbestos." *Id.* at 414. This is doubly wrong. First, the products in *Simonetta* and *Braaten were in fact* designed to be used with asbestos. The manufacturers in those cases supplied the Navy with products that required insulation to function, and the only insulation meeting Navy specifications at that time contained asbestos. *See Simonetta*, 165 Wn.2d at 347 ("Viad was aware that exposure would occur during the use and

maintenance of its product because the evaporator needed insulation to operate properly, the navy used asbestos insulation, and workers would have to disturb the asbestos insulation to perform maintenance."); *see also O'Neil v. Crane Co.*, 53 Cal. 4th 335, 343, 266 P.3d 987, 135 Cal. Rptr. 3d 288 (2012) (Navy specifications required the use of asbestos in World War II warships and "there was no acceptable substitute for asbestos until at least the late 1960's."). Thus, the majority's assertion that the products in *Simonetta* and *Braaten* "only happened to be insulated by asbestos products" is inaccurate at best. Majority at 414. The products in *Simonetta* and *Braaten* required asbestos insulation and—like the respirators here—demanded regular maintenance that resulted in asbestos exposure. *See Simonetta*, 165 Wn.2d at 366 (Stephens, J., dissenting) ("Routine maintenance of the evaporator required the removal and replacement of the asbestos insulation every three to six months.").

¶55 Second, unlike the respirators, the products in *Simonetta* and *Braaten* were *invariably used* in conjunction with asbestos. In contrast, these respirators were complete upon sale and did not require the addition of an asbestos-containing component. Moreover, these respirators were intended to protect against a number of different contaminants, including welding fumes, paint fumes, and various types of dust. The manufacturers should not be expected to warn of the dangers of every contaminant a user could conceivably encounter. Imposing such an obligation would render all the warnings given virtually meaningless: "To warn of all potential dangers would warn of nothing." *Andre v. Union Tank Car Co.*, 213 N.J. Super. 51, 67, 516 A.2d 277 (1985), *aff'd*, 216 N.J. Super. 219, 523 A.2d 278 (1987).

¶56 The majority concludes the respirator manufacturers had a duty to warn of asbestos exposure because their respirators were *intended* to protect against airborne contaminants like asbestos. Majority at 418. However, the respirator's purpose as a protective product merely made it

foreseeable it would be used around potentially dangerous substances. We held in *Simonetta* and *Braaten* that a defendant's ability to foresee certain harms is irrelevant if the defendant is outside the chain of distribution of the harmful product. These defendants have no duty to warn of the dangers of another's product, and foreseeability itself cannot give rise to a duty. *Simonetta*, 165 Wn.2d at 349 n.4.

¶57 The majority asserts we should nonetheless consider the circumstances under which the respirators would foreseeably be used to determine whether they were unreasonably dangerous. Majority at 417-18.[6] The majority is correct that the Washington product liability act sets forth a risk-benefit analysis that is used to define a product as "not reasonably safe." RCW 7.72.030(1)(b). Part of this analysis focuses on the foreseeability of the harm suffered by the plaintiff. *Id.* But, it is telling that the court in *Simonetta* or *Braaten* did not see it proper to analyze foreseeability in this context. This is because whether the defendant is in the chain of distribution of the relevant product is a threshold matter that must be determined before considering whether the product is reasonably safe. Therefore, because the respirator manufacturers were not within the chain of distribution of the relevant product (the asbestos) that caused Macias' injury (mesothelioma), as a matter of law they had no duty to warn of the dangers of

---

[6] The majority's reasoning is reminiscent of the *Simonetta* dissent. *Compare Simonetta*, 165 Wn.2d at 366 (Stephens, J., dissenting) ("[T]he focus . . . is on dangers involved in the *use* of a product. Simply put, the duty to warn contemplates that a product will *actually be used*."), *with* majority at 418 (*"every* product will be put to use at some time in the future after its manufacture, and at that point the hazards that will predictably be involved in its use will become manifest"). *Compare Simonetta*, 165 Wn.2d at 365 n.10 (Stephens, J., dissenting) ("foreseeability of harm should not be confused with foreseeability of the use of a product"), *with* majority at 417 ("But considering foreseeability in the context of determining whether the product is unsafe . . . is a different matter from considering foreseeability of injury to establish that a duty is owed."). The similarities demonstrate that the same concerns expressed by the majority were also apparent in *Simonetta*. We nevertheless concluded the foreseeability of asbestos exposure as inherent in the use of a product that does not contain asbestos is not an appropriate consideration when determining whether a duty to warn exists. *Simonetta*, 165 Wn.2d at 349-50.

asbestos. *Simonetta*, 165 Wn.2d at 350. We should not even reach the risk-benefit level of analysis.

¶58 If anything, the safety purpose of the respirators cuts against imposing liability here. A fundamental policy underlying product liability law is the promotion of safe products. Victor E. Schwartz et al., *Respirators to the Rescue: Why Tort Law Should Encourage, Not Deter, the Manufacture of Products that Make Us Safer*, 33 AM. J. TRIAL ADVOC. 13, 50-51 (2009). Safety products, such as the respirators involved in this case, are of great social value and promote this essential goal. The expansion of liability for asbestos exposure to safety product manufacturers provides a strong disincentive to continue making safety products, such as protective respirators. This could impact both the availability and affordability of respirators, frustrating the safety objective of product liability. *Id.*

¶59 The economic policies underpinning product liability law also weigh against extending liability to peripheral defendants. The manufacturer who benefits from selling a potentially dangerous product is the appropriate party to bear the risk that product will cause harm. RESTATEMENT (SECOND) OF TORTS § 402A cmt. c at 349 (1965) ("public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them"). Only the manufacturer of a product has the ability to consider its risks and determine if the product is worth distributing in spite of its hazards. *Id.* A manufacturer of safety products should not be "required to perform a watchdog function in order to rescue product users from risks it had no active part in creating and over which it cannot exert meaningful control." James A. Henderson, Jr., *Sellers of Safe Products Should Not Be Required to Rescue Users from Risks Presented By Other, More Dangerous Products*, 37 Sw. U. L. REV. 595, 601 (2008). As we stated in *Braaten*:

> These manufacturers, who did not manufacture, sell, or otherwise distribute the [products] containing asbestos to which [the

plaintiff] was exposed, did not market the product causing the harm and could not treat the burden of accidental injury caused by asbestos . . . as a cost of production against which liability insurance could be obtained.

165 Wn.2d at 392. The same rationale counsels against extending liability here. These respirator manufacturers did not inject asbestos-containing products into the market-place and should not be required to perform the duties of those who did.

¶60 The Supreme Court of California recently remarked upon this case in *O'Neil*, 53 Cal. 4th at 358 (citing *Macias v. Mine Safety Appliances Co.*, 158 Wn. App. 931, 244 P.3d 978 (2010)). The court recognized that Macias' theory of liability threatened to substantially expand Washington product liability law: "Reliance on the 'adjacent products' theory of liability was stretched perhaps the farthest in *Macias*." *Id.* The California high court then looked with favor on the Court of Appeals' decision below:

> [T]he Washington appellate court observed that the connection between the defendants' products and the plaintiff's asbestos exposure was "even more remote" than in *Simonetta* and *Braaten*. Because the respirator manufacturers did not manufacture, sell, or supply the asbestos that harmed Macias, and thus were not in the chain of distribution of a harmful product, the court held they had no duty to warn about the dangers of asbestos.

*Id.* (citation omitted) (quoting *Macias*, 158 Wn. App. at 942). We should affirm Division Two's well-reasoned opinion and decline to extend a duty to warn of asbestos exposure to manufacturers that do not produce or distribute asbestos-containing products.

¶61 The majority undermines *Simonetta* and *Braaten* while adopting the rationales of the *Simonetta/Braaten* dissents. After eliminating the false distinctions read into *Simonetta* and *Braaten* by the majority, there is simply no

difference between the products at issue in those cases and the respirators here. Each product brought the plaintiff to asbestos he otherwise would not have encountered. And in each instance, the manufacturer knew its product would be used around asbestos. Were we to be faithful to the precedent set by *Simonetta* and *Braaten*, we would hold the respirator manufacturers had no duty to warn Macias of the dangers of asbestos because they were not in the chain of distribution of asbestos-containing products. To hold manufacturers of safety equipment liable for harm caused by other manufacturers' dangerous products is contrary to precedent and public policy. I dissent.

C. JOHNSON and OWENS, JJ., and ALEXANDER, J. PRO TEM., concur with J.M. JOHNSON, J.

Rconsideration denied November 6, 2012.