# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

RONALD FAGG,

        Appellant,

    v.

BARTELLS ASBESTOS SETTLEMENT
TRUST; CATERPILLAR, INC., CERTAINTEED
CORPORATION; CNH AMERICA LLC;
CSK AUTO, INC.; DUNN LUMBER
COMPANY, INC.; E.J. BARTELL'S;
EXXONMOBIL OIL CORPORATION;
H. D. FOWLER COMPANY; MOBIL OIL
CORPORATION; PACIFIC WATER WORKS
SUPPLY COMPANY, INC.; and FIFTH DOE
through ONE HUNDREDTH DOE;

        Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 69719-6-I

DIVISION ONE

PUBLISHED OPINION

FILED: <u>December 8, 2014</u>

SPEARMAN, C.J. — Over the course of several decades, Ronald Fagg was exposed to various asbestos-containing products at work sites, during personal automotive repairs, during time vacationing and living in the Libby, Montana area. He was later diagnosed with asbestosis and asbestos related pleural disease. In this action, he seeks damages from a number of seller and manufacturer defendants, who he alleges are liable for his injuries under common law theories of negligence and strict liability. Two of the seller defendants, Pacific Water Works Supply, Inc. (PWWS) and CSK Auto, Inc. (CSK), moved for summary judgment on the grounds that Fagg's common law claims against them were barred by the Washington Product Liability Act, ch. 7.72 RCW (WPLA). The trial court agreed and dismissed the claims as to both

defendants. We affirm the trial court with respect to PWWS, but reverse with respect to CSK and remand for further proceedings.

## FACTS

In October 2009, the appellant, Ronald Fagg, was diagnosed with asbestosis and asbestos related pleural disease. He initiated this action on January 29, 2010, alleging common law negligence and strict liability against a number of defendants who were allegedly responsible for his exposure to asbestos, including the respondents, PWWS and CSK.[1]

Fagg claimed that the defendants were jointly and severally liable for his asbestos related injuries, which resulted from (1) exposure to various asbestos-containing products during his employment as a construction worker, naval machinist mate, and heavy equipment operator from 1963 through the late 1970s; (2) personal automotive repair jobs using asbestos-containing parts between the 1950s and 1980s; (3) work with cementitious asbestos-containing pipe (transite) over a period of approximately ten and a half years, beginning in the late 1970s; and (4) vacationing in the vicinity of the Libby, Montana superfund site from the early 1980s to 1990s, and living there from 2001 to 2007.

PWWS and CSK each moved for summary judgment, claiming that Fagg's negligence and strict liability claims were precluded by the WPLA, that they are immune from liability under the WPLA, and that Fagg failed to establish that exposure to PWWS

---

[1] PWWS was added by amended complaint on September 20, 2010. Bartell Asbestos Settlement Trust; Certainteed Corporation, Dunn Lumber Company, Inc., E.J. Bartell's, CNH America LLC, Caterpillar Inc., ExxonMobil Oil Corporation, H.D. Fowler Company, Mobil Oil Corporation and Fifth Doe through One Hundred Doe are not parties to this appeal.

and CSK products was a substantial factor in causing his disease. The trial court granted PWWS's and CSK's motions for summary judgment on the first ground but did not rule on the second. Fagg appeals.

<u>Fagg's Exposure to Asbestos-Containing Products Sold by PWWS</u>

For six months during 1979-1980, Fagg worked for C&D Enterprises (C&D) installing transite water mains and hydrants. From 1980 to 1985 he worked for Lake Washington Sewer and Water (Lake Washington), as a backhoe operator and repaired transite pipes. From 1985 to 1990, he worked as a backhoe operator for the City of Kirkland. Each of these jobs involved cutting twenty foot lengths of transite pipe and beveling the edges with a power saw. Each cut and bevel created large quantities of dust. Fagg personally made forty to fifty cuts and bevels of transite pipe during his employment with C&D. At Lake Washington, he made or watched from a close distance over one hundred cuts and fifty bevels of transite pipe, about half of which involved pipes already in the ground and half of which involved new pipes. CP at 427-28, 430-31. At the City of Kirkland, he made approximately fifteen cuts and ten bevels of transite pipe.

Fagg testified that the new transite pipe he worked with at C&D, Lake Washington, and City of Kirkland came from two different suppliers, one of which was PWWS, which began selling transite pipe in 1957 or 1958. In the early to mid-1960s, PWWS made deliveries of transite pipe to individual customers. In 1967 or 1968, PWWS sold its only delivery truck and permanently ceased its delivery service. But customers were still able to purchase transite pipe from PWWS retail outlets and transport the product themselves. PWWS offered evidence that it stopped selling

3

transite pipe and other asbestos-containing products in Washington and Oregon in 1984.

Fagg testified that, between 1979 and 1980, while he was employed with C&D, from time to time he would personally pick up transite pipe from PWWS's Woodinville outlet. He did not visit either of PWWS's other branches in Seattle or Tacoma. Fagg also testified that trucks would deliver transite pipe to the C&D storage yard. He understood those trucks, which were operated by C&D's drivers, were carrying transite from PWWS. Fagg estimated that at least twenty or thirty of the cuts and ten of the bevels he made while employed by C&D involved transite pipe sourced from PWWS. PWWS contradicted Fagg's testimony with evidence that its Woodinville location did not open until 1981 at the earliest and that, before 1981, PWWS only sold transite pipe out of its Seattle and Tacoma locations.

Fagg also estimated that most of the new transite he worked with at Lake Washington had come from PWWS because they "used to give...the best deal" and because of his conversations at the time of delivery with Lake Washington's truck driver. Clerk's Papers (CP) at 429-30.

Disputing PWWS's contention that it stopped selling transite in Washington and Oregon in 1984, Fagg testified that truck drivers employed by Lake Washington and the City of Kirkland delivered transite from PWWS to his work sites during 1984-90.

<u>Fagg's Exposure to Asbestos-Containing Products Sold by CSK</u>

It is undisputed that Fagg used auto parts sold by Al's Auto Supply and Schuck's Auto Supply—subsidiaries of CSK—in connection with brake, clutch, or gasket repair work on several automobiles from the 1950s to the 1980s. The record shows that Fagg

did fourteen repair jobs during that time.[2] According to Fagg's unrebutted testimony, seven jobs occurred before 1981 and one after July 26, 1981. Of the remaining six jobs, four occurred during the early 1980s and one occurred in the late 1970s or early 1980s. Fagg was unable to estimate an approximate date for the remaining job.

Fagg always bought new Bendix brakes and Victor gaskets at either Al's or Schuck's. He never removed any Bendix or Victor parts that he had previously installed. Nor did he arc or grind any of the new Bendix or Victor parts he had purchased. In general, he noticed no dust emitting from the new parts. But, "once in a blue moon" he would take a few minutes to sand a small "bump" on a brake part, which would produce a miniscule amount of dust. CP at 1026. Fagg also used compressed air to blow away

---

[2] Although the parties disagree on the precise number of repairs Fagg made using CSK parts, the record from below discloses the following:

1. In the 1950s, he replaced the brakes on his mother's 1949 Ford. CP at 859-60.
2. In the 1950s, he adjusted the clutch on a 1949 Ford pickup. CP at 876-77.
3. In the late 1950s, he replaced the brakes on a 1953 Ford. CP at 862-63.
4. In the early 1960s, he replaced the brakes and did two exhaust manifold gasket replacements on a 1957 Ford Ranchero. CP at 871-73.
5. In the early to mid-1960s, He replaced the brakes and two exhaust manifold gaskets on a 1956 Ford pickup. CP at 863-64.
6. In the 1960s, he replaced the brakes on a 1956 Ford pickup. CP at 865-66.
7. In the 1960s, he replaced the brakes on a second 1957 Ford. CP at 877-78.
8. At some point after 1968, he replaced the brakes on a 1957 Ford station wagon. CP at 875-76.
9. In the late 1970s or early 1980s, he replaced the brakes on a 1965 Volkswagen. CP at 873-74.
10. During the early 1980s, he replaced the brakes on a 1961 Ford. CP at 870-71.
11. Sometime in the 1980s, he removed the motor from a 1964 Mustang and put it into a 1956 Ford pickup. He also installed two exhaust manifold gaskets in the Mustang. CP at 868-69.
12. In the early 1980s, he replaced two exhaust manifold gaskets on a 1976 Ford. CP at 874-75.
13. Sometime between 1982 and 1985, when he was living in Monroe, Washington, he replaced the brakes and clutch on a second 1956 Ford pickup. CP at 867-68; 1033-34.
14. At an unspecified time, he replaced the brakes on a 1965 Mustang that he purchased in the 1970s and owned for six or seven years. CP at 868.

5

larger amounts of dust from previously-installed brake shoes and clutch assemblies. This resulted in "[k]ind of a cloud from all the dust that was in—that was in the brake shoes." CP at 861

Fagg produced evidence that Bendix brakes contained chrysotile asbestos until at least 1985 and that Victor gaskets contained asbestos until 1988. He also submitted a declaration by his expert, Charles Ay, which concluded, without quantifying the extent of Fagg's alleged exposure to asbestos fibers from these products, that "the installation of the Bendix brakes and Victor gaskets caused the release of respirable asbestos fibers into the air, and Mr. Fagg was injuriously exposed to respirable asbestos dust and fibers as a result." CP at 373-374.

### Fagg's Other Exposures to Asbestos-Containing Products

In addition to his exposure to PWWS and CSK products, Fagg acknowledged extensive exposure to asbestos-containing products from other sources. From 1965-1968, he served in the navy as a machinist mate and was exposed on a daily basis to asbestos from the gaskets and packing in pumps and valves that he repaired. As a part of his job, he cut away asbestos-containing insulation on steam lines and cut and installed new asbestos-containing insulation. He was also present when boiler tenders opened boilers and disturbed asbestos-containing refractory and insulation.

Fagg also worked for Sunshine Construction from 1963-1965, the two years before he entered the Navy, and again from 1968-1972 or 1973. During those years he used an estimated 400 five gallon buckets of asbestos-containing drywall compound manufactured by Kaiser Gypsum and sold to his employer by Dunn Lumber.

After leaving Sunshine Construction in 1972 or 1973, Fagg went to work as an equipment operator for the King County road department, where he stayed approximately seven years. In that job he took equipment, case backhoes and caterpillar graders, to the repair facility at least once a week. Once in the facility, he was in close proximity to mechanics as they serviced the asbestos-containing brakes on the equipment, grinding and sanding the brakes to fit, and using compressed air to blow out the brake dust.

Lastly, beginning in the early 1980s, Fagg would spend three months of each year visiting the Libby and Troy, Montana area; he lived in Troy year round from 2001 until 2007. Over the past several decades, hundreds of residents of Libby and the neighboring town of Troy have died and over 1,700 residents have been sickened as a result of asbestos contamination from W.R. Grace & Co.'s vermiculite mine.[3] In 1999, shortly before Fagg moved to Troy, the Environmental Protection Agency (EPA) began cleanup efforts in the area. At the time, the measurable asbestos fiber level in the ambient air in Libby was 10,000 times greater than in 2009, and asbestos fibers were present in "garden soil" "driveway materials," and playgrounds. See Libby Major Milestones, U.S. PROTECTION AGENCY, http://www2.epa.gov/region8/libby-major-milestones (last updated Mar. 16, 2014); see also, Andrew Schneider, Uncivil Action: A Town Left To Die, SEATTLE POST-INTELLIGENCER, NOV. 18, 1999 (reporting that by 1975, "half a million pounds of asbestos a day were processed" in the mine, leading to "5,000

---

[3] PWWS notes that we may take judicial notice of the asbestos contamination and EPA efforts in the Libby area under ER 201(b) because evidence of the contamination is in the public record. Fagg does not challenge the court's notice of this fact.

lbs./day of asbestos" dust expelled per day). Libby was placed on the EPA's superfund list in 2002 and was declared a "Public Health Emergency" in 2009.

## DISCUSSION

We review the trial court's entry of summary judgment de novo. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). Summary judgment is proper if, viewing the facts and inferences in favor of the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.; CR 56(c). Where liability depends upon a mixed question of fact and law, and the facts are disputed, a motion for summary judgment should be denied. Rathvon v. Columbia Pac. Airlines, 30 Wn. App. 193, 633 P.2d 122 (1981).

### Applicability of the WPLA

Products liability cases in Washington are governed by the WPLA. The statute immunizes product sellers from product liability claims except under certain enumerated circumstances. It provides in relevant part:

> (1) Except as provided in subsection (2) of this section, a product seller other than a manufacturer is liable to the claimant only if the claimant's harm was proximately caused by:
> (a) The negligence of such product seller; or
> (b) Breach of an express warranty made by such product seller; or
> (c) The intentional misrepresentation of facts about the product by such product seller or the intentional concealment of information about the product by such product seller.

RCW 7.72.040(1). The WPLA supplants common law claims or actions based on harm caused by a product that arise on or after its effective date, July 26, 1981. Macias v. Saberhagen Holdings, Inc., 175 Wn.2d 402, 408, 282 P.3d 1069 (2012) (citations omitted). Insofar as a negligence claim is product based, the negligence theory is subsumed within the WPLA product liability claim. Id. (Citations omitted).

8

When a plaintiff's alleged exposure to injury-causing products is prolonged or continuous in nature, as in the present case, Washington courts consider when "substantially all" of the exposure occurred in determining when the claim arises. Macias, 175 Wn.2d at 408-09; Braaten v. Saberhagen Holdings, 165 Wn.2d 373, 381 n. 1, 4, 198 P.3d 493 (2008); Koker v. Armstrong, 60 Wn. App. 466, 472 n.4, 804 P.2d 659 (1991). The parties agree the WPLA applies unless "substantially all" of the exposure occurred before July 26, 1981.[4] There is also no dispute that if the WPLA applies, the respondents are immune from suit and Fagg's claims against them were properly dismissed.

Under the Model Business Corporation Act, the term "substantially all" was intended to mean "nearly all." See MODEL BUS. CORP. ACT § 12.01 cmt. 1 (1984). Other jurisdictions have accorded the term similar meaning. See e.g., Ice Service Co., Inc. v. Comm'r of Internal Revenue, 30 F.2d 230, 230 (2d Cir. 1929) (holding that substantially all, in the context of when two corporations are affiliated for tax purposes, means all except "a negligible minority" or when a "practically negligible" amount remains); Hook v. Astrue, 2010 WL 2929562, *4 (N.D. Ohio July 9, 2010) (holding, in the context of

---

[4] This approach is consistent with our caselaw. In Koker, 60 Wn. App. at 472, Viereck, 81 Wn. App. 579, 584-85, 915 P.2d 581 (1996), and Krivanek v. Fibreboard Corp., 72 Wn. App. 632, 635, 865 P.2d 527 (1993), we held the WPLA did not apply because substantially all of the plaintiffs' exposures to asbestos occurred *before* enactment of the statute. Likewise, in Braaten, the Supreme Court "noted that the exposure to asbestos products 'substantially occurred before the enactment' of the WPLA.... [and] decided the case under common product liability and negligence law." Macias, 175 Wn.2d at 408 (citing Braaten, 165 Wn.2d at 383 n.4). In Macias, the Court expressed the test for applicability of the WPLA somewhat differently, holding that the WPLA barred the claims in that case where substantially all the plaintiff's exposure to asbestos occurred *after* enactment of the statute. Macias at 408-09. We do not perceive this to be a meaningful distinction because under the facts of Macias it is evident that, consistent with the cited precedent, substantially all of the plaintiff's exposure did *not* occur before the effective date of the WPLA. Moreover, the Macias Court expressly stated that its holding was "[i]n accord with Koker, Viereck, and Braaten." Id. at 409.

social security disability analysis, that "substantially all means 'essentially all' as opposed to 'in the main' or 'for the most part'").

In quantifying the term, courts have found "substantially all" to mean 85 percent or more. See e.g., Continental Can Co., Inc. v. Chicago Truck Drivers, 916 F.2d 1154, 1158 (7th Cir. 1990) (assets in a pension fund); Central States Southeast & Southwest Pension Fund v. Bellmont Trucking, Co., 610 F. Supp. 1505, 1511 (N.D. Ind. 1985) (employee contributions in a pension fund). Similarly, seventy-five percent and sixty-five percent have been found not to be the equivalent of "substantially all." See e.g., Theurer v. Bd. of Review, Indus. Com'n, 725 P.2d 1338 (Utah 1986) (assets acquired by dentist upon acquisition of practice); James v. McCoy Mfg. Co., 431 So.2d 1147, 1149 (Ala. 1983) (assets acquired by an employer from a former employer). For purposes of this case, however, we need not decide whether to define "substantially all" by its plain meaning or quantitatively because the outcome is the same under either definition.

As a threshold matter, the parties dispute what should be measured in determining whether substantially all of Fagg's exposure occurred before enactment of the WPLA. Fagg argues that we should consider his total exposure to asbestos from any source and then determine whether substantially all of his exposure occurred before July 26, 1981.[5] If so, and a respondent's product was a part of that exposure, then Fagg urges us to conclude that the WPLA does not apply to that respondent.

_____

[5] Specifically, he urges the court to consider all exposure during (1) his employment from 1963 through the late 1970s as a construction worker, naval machinist mate, and heavy equipment operator, which involved exposure to various asbestos-containing products; (2) personal automotive repair jobs between the 1950s and 1980s using products sold by CSK Auto; (3) work with transite pipe sold by PWWS over a period of approximately ten and a half years beginning in the late 1970s; and (4) his time vacationing and living near the Libby, Montana Superfund site from the 1980s to 2007.

10

Fagg analogizes the "substantially all" test for application of the WPLA to the "substantial factor" causation test applied in toxic exposure cases. He argues that just as a plaintiff need not "prove that a particular defendant's product was the sole cause of the injury, only that it was present in the work environment when the exposure occurred," neither should a plaintiff have to prove that substantially all of his or her exposure to asbestos before July 26, 1981 was attributable to a particular defendant, but only that the defendant's product made up a part of that exposure. Brief of Appellant at 32.

PWWS and CSK argue that we should measure a plaintiff's exposure to a specific defendant's products and only if substantially all of a plaintiff's exposure to that defendant's product occurred before July 26, 1981 can we conclude that the WPLA does not apply.[6] We agree with respondents.

In Macias, 175 Wn.2d 402, the plaintiff sued various sellers of asbestos-containing products, claiming he was exposed to their products in the naval shipyards where he worked from 1978 to 2004.[7] Id. at 405. The Court found that the plaintiff's claims as to some of the defendant sellers arose under the WPLA because all or substantially all of the plaintiff's exposure to those defendants' specific products

---

[6] Fagg argues that the respondents are "judicially estopped" from making this argument because it contradicts the position they took in the trial court. The claim is without merit for several reasons. First, PWWS argued for a defendant-specific approach in its summary judgment motion below. CP at 102-03. And, although CSK Auto argued for an aggregate approach below, it did so without the benefit of the Macias decision, which offered guidance on this issue. Lastly, we may affirm a grant of summary judgment on an issue not decided by the trial court provided that it is supported by the record and is within the pleadings and proof. Plein v. Lackey, 149 Wn.2d 214, 222, 67 P.3d 1061 (2003). To the extent that the parties argue for a defendant-specific approach on appeal, they do so to provide a basis for this court to affirm the trial court based on the record in this case. We, therefore, consider the argument.

[7] The trial court considered this case when deciding PWWS's motion for summary judgment, but not CSK Auto's.

occurred after the effective date of the WPLA. Id. at 408-09. The Court applied the WPLA to the plaintiff's claim even though he was exposed to asbestos-containing products sold by some of the defendants for at least two years before the effective date of the statute. The Court specifically addressed the applicability of the WPLA to three of the defendants, stating:

> The record indicates that Macias maintained and cleaned respirators manufactured by the Mine Safety Appliances Company and North America Safety Products USA only after June 1981. The WPLA clearly governs the claims against these defendants. With respect to American Optical Corporation, the WPLA applies, as explained, because substantially all of Mr. Macias's exposure to asbestos occurred after the effective date of the Act.

Id. at 409, n.2. In concluding that the WPLA applied to these defendants, the Court reiterated the rule that "a 'manufacturer's duty to warn is restricted to warnings based on the characteristics of the manufacturer's own products'; "[t]he law generally does not require a manufacturer to study and analyze the products of others and warn users of the risks of those products." Id. at 411, quoting Braaten, 165 Wn.2d at 385, citing American Law of Products Liability 3d §32:9 (John D. Hodson & Richard E. Kay eds. 2004); 63A Am.Jur.2d Products Liability §1127 (1997). Thus, for purposes of determining whether a claim arises under the WPLA as to a specific defendant, the determinative factor is when all or substantially all of the plaintiff's exposure to that defendants' particular asbestos-containing products occurred.

Simonetta v. Viad Corp., 165 Wn.2d 341, 197 P.3d 127 (2008) and Braaten, 165 Wn.2d 373, are in accord. In Simonetta, a former navy machinist sued the manufacturer of an evaporator, used for desalinization of sea water, alleging that the manufacturer was liable for the machinist's asbestos related disease; the machinist had been

12

exposed to asbestos insulation, which the navy had used to encapsulate the evaporator and was manufactured by a third party. In Braaten, a former pipe fitter sued the manufacturers of various valves and pumps, alleging that they were liable for his asbestos related disease; the pipe fitter had also been exposed to asbestos insulation, manufactured by a third party and used by the navy to insulate the defendants' products. In each case, the Court focused on the asbestos-containing products that were alleged to have caused the plaintiffs' injuries and whether those products were manufactured by the defendants or were in the defendants' chain of distribution. Concluding they were not, the Court held that the defendants had no duty to warn "of the dangers of exposure to asbestos in products it did not manufacture and for which the manufacturer was not in the chain of distribution." Braaten, at 398.[8]

In light of Macias, Simonetta and Braaten, Fagg's contention that we take into account all of his exposure to asbestos from any source to determine when his claim arose is untenable. Whether the respondents owe Fagg a duty at all, the breach of which gives rise to his claim, depends on the products alleged to have caused Fagg's injuries and whether those products were in the respondents' chain of distribution. Under the controlling cases, to the extent Fagg's claimed injuries arise from products outside the respondents' "chain of distribution", no duty can be attributed to them. Macias, 175 Wn.2d at 410-11. Thus, we conclude that the proper measure to determine if Fagg's claims falls under the WPLA is whether all or substantially all his exposure to the asbestos-containing products of each respondent occurred before July 26, 1981.

---

[8] Simonetta and Braaten both involved manufacturer defendants, but the analysis regarding chain of distribution seems to us equally applicable to seller-defendants who are outside the chain of distribution of their co-defendants' products.

13

## Applying the Analysis to PWWS and CSK

### PWWS

Viewing the evidence in the light most favorable to Fagg, he was exposed to PWWS's transite beginning with his employment with C&D in 1979 and concluding with his employment with the City of Kirkland in 1990. Considering only the years of Fagg's exposure to transite, it is evident that less than twenty-five percent of this time is before July 26, 1981. Thus, Fagg's pre-WPLA exposure to transite is sold by PWWS insufficient to constitute "substantially all" of his exposure to that product. By this measure, Fagg's claim against PWWS falls under the WPLA.

The result does not change when we consider the relative extent of exposure during each year of employment. Fagg made approximately fifty cuts and bevels during his time at C&D (1979-1980); seventy-five cuts and bevels to new pipe (the rest involved pipe already in the ground from unknown sources), an average of fifteen per year, at Lake Washington (1980-1985); and twenty-five cuts and bevels, an average of five per year, at City of Kirkland (1980-1990). Of his approximately 150 total cuts and bevels between 1979 and 1990, an average of fifty-nine cuts and bevels, or thirty-nine percent, occurred before July 26, 1981. Because this amount cannot be considered substantially all, the trial court properly concluded that Fagg's claims arose under the WPLA and did not err in dismissing them.

### CSK

Fagg claims he was exposed to asbestos-containing auto parts purchased from CSK on fourteen occasions beginning in the 1950s through the 1980s. Viewing the evidence in the light most favorable to him, thirteen of those exposures occurred before

July 26, 1981: Fagg testified that seven occurred before 1981, five in the early 1980s, and one in late 1970 or early 1980. Therefore, we conclude that because substantially all of Fagg's exposure to CSK's asbestos-containing products occurred before July 26, 1981, the WPLA does not apply with respect to Fagg's claims against CSK. The trial court erred in entering summary judgment for CSK on this ground.[9]

Affirm with respect to PWWS. Reverse with respect to CSK.

WE CONCUR:

Spearman, C.J.

Cox, J.

---

[9] Although CSK also moved for summary judgment on grounds that Fagg failed to raise a disputed issue of fact regarding causation, the trial court did not rule on that issue and CSK did not brief the issue on appeal. Accordingly, we do not reach that issue in our opinion.