# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re PATRICIA L. FORSBERG SPOUSAL TRUST u/w of WALTER A. FORSBERG, <br><br> Deceased. <br><br> ——————————————————— <br><br> PAULINE FORSBERG & LESLIE FORSBERG, <br><br> Appellants, <br><br> v. <br><br> PATRICIA L. FORSBERG, in her Representative Capacity as Trustee of the Patricia L. Forsberg Spousal Trust and in her Individual Capacity; REBECCA and JAMES HINKEN, and their Marital Community; PARIS (aka PENELOPE) & FRED LUJAN, and their Marital Community; DEBORAH and MICHAEL SOMERS, and their Marital Community; and all Persons or Parties Unknown Claiming any Right, Title, Estate Lien, Or Interest in the Real Estate Described in the Complaint herein, <br><br> Respondents. | No. 46251-6-II <br><br><br> UNPUBLISHED OPINION |

BJORGEN, J. — Pauline and Leslie Forsberg, daughters of the deceased, Walter A.

Forsberg, and his first wife,[1] appeal from the trial court's summary judgment ruling in favor of

———————————————

[1] Patricia's daughters and sons-in-law are Rebecca and James Hinken, Paris and Fred Lujan, and Deborah and Michael Somers. We refer to Patricia, her daughters, and their husbands collectively as "Patricia." We refer to Pauline and Leslie as "Pauline."

Patricia L. Forsberg, Walter's second wife, and her daughters from her first marriage and their husbands. Pauline sued Patricia, claiming that Patricia gave around $1.4 million in assets to the children of her first marriage in violation of Patricia's and Walter's mutual wills and the associated Forsberg Property Agreement (Agreement) and requesting various forms of relief, including setting aside the transfers. Pauline contends that the trial court erred in ruling (1) that the claims were barred by her failure to timely challenge Patricia's administration of Walter's will and (2) that Patricia made the gifts in compliance with the terms and underlying intent of the Agreement and mutual wills. We reverse the order of summary judgment in favor of Patricia and remand for entry of partial summary judgment in favor of Pauline.

FACTS

Walter and Patricia married in 1975. Although they had no children together, both had children from previous marriages: Walter's two daughters, the appellants; and Patricia's three daughters, who are among the respondents. Walter and Patricia acquired some community property, but until Walter's death held most of their nearly $6.8 million in assets as separate property, maintaining that status throughout the marriage.

I. THE ESTATE PLANNING INSTRUMENTS

In December 2003, Walter and Patricia executed the Agreement and mutual wills, which documents incorporate one another by reference.[2] The Agreement provides that

> [a]ll of the property as now owned and hereafter acquired by the Husband and Wife shall be community property of Husband and Wife . . . under the laws of the state of Washington upon the death of the first spouse to die.

_____

[2] Patricia's will does not appear in the record. Patricia does not dispute that her will incorporates Walter's will and the Agreement by reference, however.

Clerk's Papers (CP) at 281. The Agreement describes Walter and Patricia's intent to provide for one another in life and distribute their wealth to their children after their deaths as follows:

> Husband's and Wife's intent, as set forth in each of their wills, is to provide for each other's health, support and maintenance in their accustomed manner of living and, after both of their deaths, to dispose of their combined estates, to their respective children or issue in proportion to their relative ownership of property prior to it[ ]becoming community property.

CP at 280-81. Consistently with this intent, the Agreement specifies that each spouse's will would establish a trust for the benefit of the surviving spouse and that, after the deaths of both spouses, the "combined estates" would pass to their children:

> Husband and Wife each agree to execute mutual wills contemporaneously with this Agreement. The Last Will and Testament of Husband and Wife shall include one or more trusts that provide for the health, support and maintenance of the surviving spouse in his or her accustomed manner of living. The trust provisions in Husband and Wife's wills shall also provide, upon the death of both spouses, for the distribution of their combined estates, after distribution of specific gifts, to their respective children or issue.

CP at 281.

The Agreement establishes a formula[3] for determining the proportion of the "combined estates" that will go to each spouse's descendants:

> The ultimate distribution of Husband and Wife's combined estates to their children or issue shall be completed in a manner that is proportionate to Husband and Wife's relative ownership of all property prior to the time it becomes community property . . . (hereinafter referred to as "percentage of relative ownership"). Husband's percentage of relative ownership shall be distributed to his children or issue, and Wife's percentage of relative ownership shall be distributed to her children or issue. Husband and Wife's percentage of relative ownership shall be determined upon the death of the first spouse to die, and it shall

---

[3] The Agreement and mutual wills exclude certain small bequests to specific organizations and most tangible personal property from distribution according to this formula, and designate particular parcels of real property—the "Forsberg farm" and the "Teepee property"—that must ultimately pass to Walter's and Patricia's descendants, respectively. CP at 282. Those provisions have no bearing on our analysis, and we do not further address them.

be based upon the value of the property included in their combined estates as of the date of the death of the first spouse to die.

CP at 281. The Agreement further prohibits the surviving spouse from changing the will's terms, except with respect to "her percentage of relative ownership":

> Husband and Wife shall not modify or revoke the terms of this Agreement or their last Will and Testament after the death of the other; provided, however, the surviving spouse may dispose of his or her percentage of relative ownership as he or she chooses.

CP at 282. The Agreement expressly designates Walter's and Patricia's descendants as intended beneficiaries, entitled to enforce its terms:

> This Agreement shall bind the parties and their respective heirs, executors and administrators. The terms of this Agreement are intended as a contract for the benefit of the parties, their children and their children's issue, and this Agreement may be specifically enforced by any of them.

CP at 282.

Walter's will referred to Patricia's will and the Agreement, and described their mutual intent consistently with the Agreement:

> I have entered into the Forsberg Property Agreement with my spouse dated December 17, 2003. The terms of the Agreement provide that all property owned by me and my spouse shall be community property upon the death of the first one of us to die. We have also agreed to execute mutual wills which include a specific plan for ultimate distribution of all of our combined property as set forth in our wills. The distribution plan set forth in this will cannot be modified or revoked, unless both my spouse and I mutually agree to a modification or revocation in writing. We have agreed that our wills shall be binding, not only on ourselves but also to our heirs, beneficiaries, successors and/or assigns.

CP at 302. The will appointed Patricia personal representative, or Pauline if Patricia could not so act, or Leslie if neither Patricia nor Pauline could act.

Consistently with the Agreement, the will created a trust for Patricia's benefit "to provide for her health, support and maintenance in her accustomed manner of living," with a remainder interest in Walter's and Patricia's descendants. CP at 306-08. The residue of Walter's estate, defined as "all probate estate property" Walter owned at death, less certain specific bequests and estate expenses, funded the trust. CP at 306.

The will provided for appointment of the trustee in the same order of preference as the personal representative: Patricia, then Pauline, then Leslie. It designated Patricia sole beneficiary during her lifetime with the entire net income distributed to her monthly or quarterly, and authorized the trustee to distribute the principal if necessary "to accomplish the trust purposes," specifying, however, that the "[t]rustee may consider and give effect to other resources and support available to" Patricia. CP at 306-07.

Once Patricia dies, the trust terminates and the trustee must distribute the remaining property, with a portion equal to Walter's percentage of relative ownership going to Walter's daughters in equal shares and a portion equal to Patricia's percentage of relative ownership going to her daughters in equal shares. The will specifies that the percentages of relative ownership shall be determined according to the Agreement, as described above.

II. WALTER'S DEATH AND PROBATE OF HIS WILL

Walter died July 1, 2009. Patricia, acting as personal representative with nonintervention powers, had her and Walter's property inventoried, appraised, and characterized according to the Agreement. The total appraised value of all the property came to $6,770,886.13, of which $4,915,209.89 was Walter's separate property and $1,732,263.18 was Patricia's, yielding percentages of relative ownership of 73.5 percent for Walter and 26.5 percent for Patricia.

In June 2010, the attorney representing Patricia in her capacity as personal representative sent Pauline a letter with, among other things, a copy of the Agreement and will, the asset inventory,

> a summary of the estate plan [Walter and Patricia] developed, a description of the property they owned at the time [Walter] passed away, an analysis of the relative ownership interests [Walter and Patricia] had in that property, and a proposal for the distribution of the assets of [Walter]'s estate.

CP at 316-20. The letter explains that the "recharacterization of all of the estate property as community property was done primarily to minimize or avoid an estate tax on [Walter]'s portion of the estate assets." CP at 317. The letter goes on to explain that

> [alt]hough the Inventory characterizes all of the estate assets as community property, the Property Agreement preserves each spouse's percentage of relative ownership in the estate assets by requiring that the assets shall be put into a trust for the benefit of the surviving spouse, and that, upon the death of the surviving spouse, the total remaining estate shall be distributed among both spouses' children according to each spouse's percentage of relative ownership. . . . [Patricia] will be the beneficiary of a trust that contains all of [Walter]'s and her assets, and she may sell any of the assets . . . if the income of the trust estate is not sufficient to support her. On her death, the remaining assets shall be distributed in accordance with the percentage of relative ownership.

CP at 317-18.

The letter goes on to describe Patricia's dissatisfaction with the Agreement's distribution formula:

> As you can imagine, [Patricia] was shocked and disappointed to learn that her relative interest in the total estate could be only slightly more than one-quarter of the value of the estate. After nearly 35 years of marriage, and particularly given the humble circumstances of the early years of the marriage and the history of [Patricia]'s contributions to the marital community, [Patricia] had expected that her percentage interest in the estate would be no less than 50% so that she will have a generous legacy to leave to her children. At the time [Patricia] signed the Property Agreement, she did not realize, nor did she anticipate, that, upon her death, her children would be receiving less than 50% of the overall value of the assets she and your father had accumulated. Later, when this outcome became clear to her, she

6

and your father discussed it and they planned to adjust their estate plan to avoid such a result. Unfortunately, your father passed away before they could consult with their attorney about modifying the Property Agreement.

CP at 318-19. The letter then proposed an alternative arrangement under which Pauline would have immediately received 50 percent of the combined assets and surrendered any future claim against Patricia's estate. Pauline did not accept this offer.

In June 2011, Patricia's attorney sent Pauline another letter with "an explanation of the allocation of property pursuant to [Walter]'s Will, a proposal for the distribution of the assets of the Trust for Patricia L. Forsberg, and a summary of the administration of [Walter]'s estate." CP at 322-23. It informed Pauline that Patricia had filed a Declaration of Completion of Probate (Declaration) in the probate proceeding and was ready to close the estate, and that "the probate estate will be deemed to be closed and [Patricia] will be discharged as Personal Representative, unless [Pauline] take[s] action as set forth in the Declaration and the Notice of Filing Declaration of Completion of Probate enclosed." CP at 325.

This second letter described the effect of the estate planning documents very differently than the first, such that only half of the total assets funded the trust and the other half passed to Patricia directly, with the descendants retaining a remainder interest:

> [Walter] and [Patricia] executed the Forsberg Property Agreement in December, 2003, according to which all of the property owned by them is to be characterized as their marital community property upon [Walter]'s passing. The Property Agreement further provides that the assets of [Walter]'s probate estate, that is, his one-half of the total property, shall be put into a trust for [Patricia]'s benefit. The other half of the total property shall pass outright to [Patricia]. When [Patricia] passes away, the total remaining estate, consisting of what is left of the assets of the trust and the assets that went directly to [Patricia], shall be combined and then distributed to both of you and to [Patricia]'s children in accordance with each spouse's original relative ownership interests in the total estate.

CP at 323. The letter states that "[a]s for those assets that have been distributed outright to her,

[Patricia] is entitled to use them as she pleases during her lifetime." CP at 324.

The second letter also contained an offer to distribute the trust assets immediately to

Pauline:

> It is still possible for you to receive the assets of the Trust now, rather than waiting until [Patricia] passes away. [Patricia] is willing to enter into an agreement with you so that the assets of the Trust are disbursed to the two of you and she would no longer be entitled to receive the Trust income or to spend Trust principal for her living expenses. Instead, [Patricia] would be limited to living off the assets that she received outright when the estate was allocated between her and the Trust. An early distribution of the Trust estate to you would mean that you would have immediate possession and control of the real property and financial assets of the Trust at their present value, rather than having to wait to receive your portion of what remains of them after [Patricia] passes away.

CP at 324. Pauline did not accept this offer either.

The Declaration included with the letter states that the residue of the estate passed to

Patricia as trustee of the Trust for Patricia L. Forsberg. It recites that "[t]he Personal

Representative has completed the probate of the Decedent's estate without court intervention,

and the estate is ready to be closed." CP at 156. The accompanying notice of filing of the

Declaration warns:

> Unless you file a petition with the Court requesting the Court to approve the reasonableness of the fees, or for an accounting, or both, and serve a copy of the petition upon the Personal Representative or the attorney for the Personal Representative within thirty (30) days after the above filing date:
>     . . .
>     (ii) The Declaration of Completion of Probate will be final and deemed the equivalent of a decree of distribution entered under Chapter 11.76 RCW;
>     (iii) The acts that the Personal Representative performed before the Declaration of Completion of Probate was filed will be deemed approved, and the Personal Representative will be automatically discharged without further order of the Court with respect to all such acts.

CP at 158.

8

Patricia's attorney also enclosed a copy of an Allocation Agreement between Patricia, acting as personal representative of Walter's estate, and Patricia, acting in her individual capacity. The Allocation Agreement recites that "each party owns an undivided one-half interest in various estate assets, and they each wish to allocate assets between them to the end that they each will own certain assets free and clear of any claims of the other." CP at 328. The document purports to transfer interests in specifically itemized assets, amounting to exactly half of the total value of Walter's and Patricia's combined property, to the estate, and the remainder, consisting of the other half of the total value, to Patricia individually.

Pauline did not file a petition or demand an accounting in the probate proceeding, so the estate closed and Patricia was discharged as personal representative 30 days after filing the Declaration. *See* RCW 11.68.110. Neither the Declaration nor the accompanying notice, however, mentions the Allocation Agreement, which Patricia did not file in the probate court.

### III. PATRICIA'S GIFTS OF PROPERTY SHE TOOK UNDER WALTER'S WILL AND THE AGREEMENT

In March 2013, Leslie drove by the "Forsberg-Fisher Property," consisting of several contiguous parcels of real estate that Walter had formerly held as his separate property, and noticed a logging operation underway. The Allocation Agreement had purported to transfer Walter's estate's interest in the Forsberg-Fisher parcels to Patricia individually. Upon inquiry, Patricia admitted that she had given the property, valued at $1.2 million as of Walter's death, to her daughters and sons-in-law. The statutory warranty deeds confirm, and Patricia admits, that the grantees gave no consideration for the property. Some of the grantees subsequently listed portions of the property for sale.

After filing this suit, Pauline learned in discovery that Patricia had also made cash gifts to her daughters and sons-in-law totaling $216,000, as well as numerous contributions to various charitable organizations totaling about $5,000. Thus, Patricia gave away almost 21 percent of the total date-of-death value of her and Walter's combined assets, almost entirely to her daughters and sons-in-law. Patricia explained that she "wanted to make gifts during [her] lifetime so [she] could enjoy the pleasure of sharing with [her] children and with organizations that are important to [her]." CP at 88. She also admitted in discovery that she did not notify Pauline of her intent to give the Forsberg-Fisher parcels to her descendants and that, as a result of the gift, Pauline would ultimately inherit less than Walter's percentage of relative ownership of the combined assets that Walter and Patricia owned at the time of Walter's death.

PROCEDURAL HISTORY

In September 2013, Pauline filed a Petition for Removal of Trustee, Appointment of Successor Trustee, Accounting, Declaratory Judgment, Specific Performance, and Damages under chapter 11.96A RCW, Trust and Estate Dispute Resolution Act (TEDRA), naming as respondent, Patricia, individually and in her capacity as trustee of the spousal trust. Shortly thereafter, Pauline filed an amended petition, adding Complaint To Quiet Title and Vacate Deeds to the caption and adding Patricia's daughters and sons-in-law, and their marital communities, as respondents. The amended petition included claims for the following: breach of contract, removal of trustee, accounting, declaratory judgment, specific performance, injunctive relief, damages, vacation of deeds, quiet title, and attorney fees. The breach of contract claim relied on Pauline's third party beneficiary status under the Agreement and mutual wills.

The amended petition set forth the facts largely as described above and prayed for (1) an injunction prohibiting Patricia and her daughters and sons-in-law "from selling, giving away, encumbering, conveying or otherwise disposing of any of the property owned by Walter Forsberg and/or Patricia Forsberg at the time of Walter's death," (2) removal of Patricia and appointment of Pauline, or a professional fiduciary, as trustee of the spousal trust, (3) orders requiring Patricia to provide an accounting showing the disposition and status of all property she and Walter owned at the time of his death and to transfer all such property to the trust, (4) a declaration that Patricia breached her fiduciary duty by improperly funding and managing the trust, (5) an order requiring Patricia to reimburse the trust for losses sustained as a result of her alleged breach of fiduciary duty, (6) declarations voiding the transfer of the Forsberg-Fisher parcels, (7) orders quieting title in the trust to the Forsberg-Fisher parcels and all other realty Patricia and Walter owned as of Walter's death, (8) reasonable attorney fees, and (9) "such further relief as the court deems just and equitable." CP at 276.

Patricia responded to the petition, admitting many of the factual allegations and asserting the affirmative defenses of "laches, estoppel, waiver, failure to state a claim upon which relief can be granted, failure to mitigate damages, release, res judicata, and statute of limitations." CP at 224. The answer prayed for dismissal of the petition with prejudice, attorney fees, and "[s]uch other and further relief as the Court deems appropriate." CP at 224.

Patricia moved for partial summary judgment, contending in support of the motion that Pauline's

> claims for breach of contract, declaratory judgment, specific performance, injunctive relief, vacation of deeds, and quiet title all relate to the manner in which property . . . was conveyed from the Estate either to Patricia outright, or to a testamentary trust established under the terms of Walter Forsberg's Last Will and Testament.

11

CP at 146. From this, Patricia argued that Pauline's failure to file a petition in the probate proceeding, prior to Patricia's discharge as personal representative, waived those claims.

Pauline cross-moved for partial summary judgment, arguing that Patricia had violated the Agreement and mutual wills as a matter of law by giving away the Forsberg-Fisher property. Pauline further argued that Patricia had, as a matter of law, breached her fiduciary duty as trustee of the trust, and Pauline asked the court to void the gifts of the Forsberg-Fisher property and rule that Patricia had violated her fiduciary duty as trustee.

The trial court granted Patricia's motion, denied Pauline's, and dismissed the claims at issue with prejudice. In a memorandum opinion, the court agreed that Pauline's failure to file a petition in the probate proceeding prior to Patricia's discharge as personal representative barred the claims. As an alternative basis for its decision, the court ruled that Pauline's claims were "not supported by relevant law or facts," CP at 24, reasoning as follows:

> Patricia Forsberg is carrying out the plans she and her late husband had for the disposition of their property. When Walter Forsberg died, their property was characterized as community property. One-half of this community property passed directly to Patricia Forsberg and the other half was put into a trust for Patricia Forsberg's benefit. At Patricia Forsberg's death, the remaining estate will be distributed to the parties' children in accordance with Walter and Patricia Forsberg's original relative ownership interests in the property.
>
> Patricia Forsberg is not giving away property that should have been transferred to the trust, but is simply exercising dominion and control over her one-half interest in the estate in accordance with the Will, the FPA and applicable Washington law.

CP at 26.

Pauline appeals.

ANALYSIS

After setting forth the standard of review, we first address the effect on Pauline's claims of Patricia's discharge as personal representative in the probate proceeding. Concluding that the

closing of the estate does not bar the claims regarding Patricia's inter vivos gifts, the funding of the trust with only one half of the combined assets, and the Allocation Agreement, we then consider whether the trial court should have granted summary judgment to Pauline on those claims. Finally, we turn to the trial court's attorney fee award and the parties' requests for attorney fees on appeal.

## I. STANDARD OF REVIEW

We review a grant of summary judgment de novo, performing the same inquiry as the trial court. *Macias v. Saberhagen Holdings, Inc.*, 175 Wn.2d 402, 407, 282 P.3d 1069 (2012). Under CR 56(c), summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A material fact is one on which the outcome of the litigation depends in whole or in part. *Atherton Condo. Apt.-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). Interpreting CR 56, our Supreme Court has held that courts should grant summary judgment only if reasonable persons could reach but one conclusion from all the evidence. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). In determining whether summary judgment was proper, the appellate court must consider the facts, and the reasonable inferences therefrom, in the light most favorable to the nonmoving party. *Vallandigham*, 154 Wn.2d at 26; *Atherton*, 115 Wn.2d at 516.

We review a trial court's interpretation of a will de novo. *Estate of Burks v. Kidd*, 124 Wn. App. 327, 331, 100 P.3d 328 (2004). The interpretation of a contract also presents a question of law reviewed de novo, aside from factual findings or inferences the trial court may

13

have drawn from extrinsic evidence. *See Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 711-12, 334 P.3d 116 (2014).

## II. PATRICIA'S DISCHARGE AS PERSONAL REPRESENTATIVE DOES NOT BAR PAULINE'S CLAIMS

Pauline contends that Patricia's discharge as personal representative does not bar Pauline's claims, because they challenge actions Patricia took in her personal capacity and as trustee of the spousal trust, not Patricia's distribution of estate assets as personal representative. Pauline also argues that "[t]he Allocation Agreement should not be considered part of the Declaration of Completion, because" Patricia never filed the Allocation Agreement in the probate court and the Declaration does not mention it, robbing the Agreement of any preclusive effect. Br. of Appellant at 16-18.

Patricia counters that Pauline's claims "all arise from actions [Patricia] took as Personal Representative" and are time barred by RCW 11.68.110 and constitute impermissible collateral attacks on the probate of Walter's estate. Br. of Resp't at 23. Thus, Patricia maintains that Pauline cannot now complain about how Patricia divided property between herself and the trust or what she subsequently did with the property she distributed to herself individually.

The statute governing the discharge of a personal representative with nonintervention powers provides:

> Subject to the requirement of notice as provided in this section, unless an heir, devisee, or legatee of a decedent petitions the court either for an order requiring the personal representative to obtain court approval of the amount of fees paid or to be paid to the personal representative, lawyers, appraisers, or accountants, or for an order requiring an accounting, or both, within thirty days from the date of filing a declaration of completion of probate, the personal representative will be automatically discharged without further order of the court and the representative's powers will cease thirty days after the filing of the declaration of completion of probate, and the declaration of completion of probate shall, at that time, be the equivalent of the entry of a decree of distribution in accordance with chapter 11.76 RCW for all legal intents and purposes.

14

RCW 11.68.110(2). The statute sets forth the required contents of the notice the personal representative must send to the interested parties regarding the Declaration, which the notice at issue here contained, including the following:

> unless you shall file a petition in the above-entitled court requesting the court to approve the reasonableness of the fees, or for an accounting, or both, and serve a copy thereof upon the personal representative or the personal representative's lawyer, within thirty days after the date of the filing, the amount of fees paid or to be paid will be deemed reasonable, the acts of the personal representative will be deemed approved, the personal representative will be automatically discharged without further order of the court, and the Declaration of Completion of Probate will be final and deemed the equivalent of a Decree of Distribution entered under chapter 11.76 RCW.

RCW 11.68.110(3).

Pauline did not object or file her petition within this 30-day period. Thus, if Patricia gave effective notice through the Declaration and accompanying notice of the actions Pauline here challenges, Pauline's claim is barred and the Declaration has the effect of a Decree of Distribution. *See In re Estate of Harder*, 185 Wn. App. 378, 384, 341 P.3d 342 (2015).

Pauline concedes that she received, along with the notice of the Declaration, notice that Patricia had funded the trust with only half of the combined assets and entered the Allocation Agreement as personal representative. However, because the Declaration and accompanying notice did not give Pauline sufficient notice that she had to object in the probate court to preserve her claims under the Agreement and mutual will contract, we hold that Pauline's failure to seek an accounting in the probate court within 30 days of the filing of the Declaration does not preclude her claims.

The Declaration identifies only a distribution to Patricia as trustee of the spousal trust, not any distribution of assets to Patricia individually. Nothing in the Declaration or in the associated notice reasonably apprises Pauline that Patricia is taking 50 percent of the combined assets

15

outright under the Agreement and will and is authorized, based on her actions during the probate proceeding, to make inter vivos gifts to her preferred devisees without limitation from that 50 percent.

The Agreement and mutual will contract unambiguously require that all of the couple's combined assets, except for those needed to provide for Patricia's health, support, and maintenance during her lifetime, be ultimately distributed to their children according to each spouse's percentage of relative ownership, as described in the Facts, above. The only exception is that the Agreement allows the surviving spouse to dispose of her percentage of relative ownership as she desires. Patricia's position, that she took 50 percent of the combined assets outright upon Walter's death with full authority to dispose of that portion to her children, starkly contradicts the terms and intent of the Agreement and mutual wills, and nothing in the Declaration gave Pauline notice that such a fundamental shift in the ultimate distribution was at stake.

In fact, Pauline had no reason to know that she needed to challenge Patricia's actions until Pauline learned of the inter vivos gifts. Only then did Pauline know that Patricia claimed the authority to give up to half of the couple's combined property to her daughters, thus reducing the amount Pauline would ultimately receive under the Agreement and mutual wills.

*Harder*, the case on which Patricia relies, does not save the inadequate notice that Pauline received. Although *Harder* dealt with the same statute, the adequacy of the notice triggering the 30-day deadline was not at issue. *Harder*, 185 Wn. App. at 384. Instead, the decision centered on whether issuing a notice of mediation was sufficient to meet that deadline, once triggered. *Harder*, 185 Wn. App. at 384.

In asserting that Pauline waived her claims by failing to raise them in the probate proceeding, Patricia also relies on the language in her attorney's June 2011 letter to Pauline that "[a]s for those assets that have been distributed outright to her, [Patricia] is entitled to use them as she pleases during her lifetime," and on language in the Allocation Agreement between herself and the estate stating that "each will own certain assets free and clear of any claims of the other." CP at 324, 328. As described above, the June 2011 letter followed the June 2010 letter from the same attorney in which Patricia expressed dissatisfaction with the Allocation Agreement's distribution formula and proposed an alternative. The 2011 letter also proposed an alternative solution. Pauline responded to neither letter. These letters, consequently, are most reasonably taken as a statement of disagreement and proposal of settlement. In that context, the statement just quoted from the 2011 letter cannot serve as notice to Pauline that she will be bound by Patricia's proposal if she fails to object within the 30-day period. Perhaps more to the point, even if we accepted, arguendo, that under the Allocation Agreement and other documents, Patricia owns half of the combined assets free of any claim of Walter's estate, it does not follow that she owns it free of any claim of the beneficiaries of her own mutual will contract and the Agreement or that she may give that property away in a manner that fundamentally alters the ultimate distribution formula those instruments established.

For these reasons, the Declaration, its accompanying notice, the Allocation Agreement, and the 2011 letter did not give Pauline reasonable notice that she needed to object within the 30-day period to preserve her objections to Patricia's actions.[4] The trial court erred in ruling that

---

[4] Although the appellants do not raise the issue, we also note the rule in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950):

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under

Pauline's failure to seek an accounting in the probate court barred her claims. We now turn to the merits of those claims.

### III. PATRICIA'S GIFTS VIOLATE THE AGREEMENT AND MUTUAL WILLS

Pauline contends that Patricia's inter vivos gifts violate the terms of the Agreement and mutual wills, because they result in an ultimate distribution of the combined assets as of Walter's death that is different than that specified by the Agreement's percentage-of-relative-ownership formula. Patricia counters that her actions "were consistent with the powers granted to her under Walter's Will," and that the mutual wills and Agreement placed "[n]o limits . . . on the surviving spouse's use of the property received directly as her half of the community property during her lifetime." Br. of Resp't at 33; CP at 35. From this Patricia argues that the Agreement and mutual wills authorized her inter vivos gifts. We agree with Pauline.

In construing a will, our "paramount duty . . . is to give effect to the testator's intent." *In re Estate of Bergau*, 103 Wn.2d 431, 435, 693 P.2d 703 (1985). Washington's will statute mandates that "[a]ll courts and others concerned in the execution of last wills shall have due regard to the direction of the will, and the true intent and meaning of the testator, in all matters brought before them." RCW 11.12.230. We must, if possible, ascertain such intent "from the language of the will itself." *Bergau*, 103 Wn.2d at 435. We consider the will "in its entirety" and give effect to "every part thereof." *Bergau*, 103 Wn.2d at 435. In addition,

> [b]ecause a testator employs language in the will with regard to facts within his knowledge, the court must consider all the surrounding circumstances, the objects sought to be obtained, the testator's relationship to the parties named in the will, his disposition as evidenced by provisions to be made for them and the general trend of his benevolences as disclosed by the testament.

---

all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

*Bergau*, 103 Wn.2d at 436.

"[A] mutual agreement to devise to third parties by will" is a contract effective from the date of execution. *Raab v. Wallerich*, 46 Wn.2d 375, 383, 282 P.2d 271 (1955). Similarly,

> [j]oint or mutual wills, made upon proper understanding and executed pursuant to a contract or policy designed to settle the probable interests of the testators and looking to the just provision of those having a claim upon their bounty, partake of the nature of a contract and may be specifically enforced.

*Prince v. Prince*, 64 Wash. 552, 556, 117 P. 255 (1911). As applied to wills, the doctrine of election requires "that one who takes under a will must conform to all its provisions, and if he accepts a benefit thereunder he must renounce every right inconsistent therewith." *Tacoma Sav. & Loan Ass'n v. Nadham*, 14 Wn.2d 576, 596-97, 128 P.2d 982 (1942).

Consistently with these principles, if one spouse who is a party to a mutual will agreement dies while it remains in effect, the agreement becomes irrevocable:

> "If two testators who have united in the execution of a mutual will have devised their property to each other so that the devises form a mutual consideration, neither, after the death of the other and the probate of the will as to it, is at liberty, after accepting the benefit conferred, to repudiate the contract to the injury of the heirs or next of kin of the testator who predeceased him. The mutual will was made upon condition that the whole shall be but one transaction. If the will is not revoked during the joint lives of the testators, he who dies first has a right to rely upon the promise of the survivor. He has fulfilled his part of the agreement, and it is not just to his representatives to permit a revocation when he has been prevented from revoking his will by a reliance upon the other's promise. It is too late for the survivor, after receiving the benefit, to change his mind because the first will is then irrevocable. It would have been differently framed, or perhaps not made at all, if it had not been for his inducement."

*Prince*, 64 Wash. at 558 (quoting 1 H.C. UNDERHILL, LAW OF WILLS, at 20 (1900)). As discussed, the mutual wills and the Agreement at issue here expressly specify that they are irrevocable without the mutual written consent of the parties.

19

As in the case of wills, "[t]he touchstone of contract interpretation is the parties' intent." *Tanner Elec. Co-op. v. Puget Sound Power & Light Co.*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996). Washington courts "follow the objective manifestation theory of contracts," determining the parties' intent "by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties" and imputing "an intention corresponding to the reasonable meaning of the words used." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005).

The plain language of the Agreement unambiguously expresses the underlying intent of the parties: after providing for the "health, support and maintenance" of the surviving spouse in his or her "accustomed manner of living," the parties intended "to dispose of their combined estates, to their respective children or issue in proportion to their relative ownership of property prior to its becoming community property." CP at 280-81. The Agreement also states that "the ultimate distribution of [Walter]'s and [Patricia]'s combined estates to their children or issue shall be completed in a manner that is proportionate to [Walter] and [Patricia]'s relative ownership of all property prior to the time it becomes community property" and that Walter and Patricia's percentage of relative ownership shall be determined upon the death of the first spouse to die. The percentages of relative ownership shall be based upon the value of the property included in their combined estates as of the date of the death of the first spouse to die. In addition, the Agreement specifies that "[Walter]'s percentage of relative ownership shall be distributed to his children or issue, and [Patricia]'s percentage of relative ownership shall be distributed to her children or issue," subject, as noted above, to the right of the surviving spouse to dispose of her percentage of relative ownership as she wishes.

20

Thus, the plain language of the Agreement demonstrates an intent to ensure that, regardless of which spouse dies first, their children ultimately receive Walter's and Patricia's respective percentages of relative ownership of the couple's total combined assets, determined as of the death of the first spouse, less the amount necessary to provide for the surviving spouse in his or her accustomed manner of living. The parties intended that the "combined" property as of Walter's death would provide not just the basis for calculating the percentages of relative ownership, but also would be the corpus against which those percentages would be applied, after subtraction of amounts needed to provide for the surviving spouse. Consistently with this understanding, Walter's will states that "[w]e have also agreed to execute mutual wills which include a specific plan for ultimate distribution of all of our combined property as set forth in our wills." CP at 302. Thus, the property subject to the Agreement is plainly not limited to whatever remains when Patricia dies.

Under Patricia's interpretation of the Agreement, Walter's descendants could, due to Patricia's inter vivos giving, receive as little as 36.75 percent of the combined assets upon her death (73.5 percent of one half of the total remaining) because he died first; but could have received up to 86.75 percent (half of the total plus 73.5 percent of the other half of the total) had Patricia died first and Walter given his daughters one half of the newly created community property. Conversely, Patricia's descendants could receive as much as 63.25 percent of the total (one half plus 26.5 percent of the other half) under Patricia's interpretation, but could have received as little as 13.25 percent had she died first. Such a result is absurd in light of the unambiguous language just discussed.

The community property provision on which Patricia's argument entirely relies in no way detracts from the clarity of the language expressing the intent underlying the Agreement and

21

mutual wills. The provision cannot reasonably be read to demonstrate the parties' intent to allow for an "ultimate distribution of all of [their] combined property," CP at 302, that could so dramatically differ depending on which spouse died first.

We also consider Patricia's decision to fund the trust with only 50 percent of the combined assets after Walter's death inconsistent with the plain language of the Agreement and mutual wills. The trust was to be funded with the residue of Walter's estate. The will defines the residue of the estate in relevant part as "all probate estate property which [Walter] own[ed] at the time of [his] death." CP at 306. Thus, Walter's separate property and one half of the pre-death community property should have funded the trust. This includes, but is not limited to, the Forsberg-Fisher property, which Walter held as separate property until his death. It should have gone into the trust corpus.

Patricia's argument in defense of her actions relies on the basic principle of contract law "that the general law in force at the time of the formation of the contract is a part thereof." *Arnim v. Shoreline Sch. Dist. No. 412*, 23 Wn. App. 150, 153, 594 P.2d 1380 (1979). Because the probate statute provides that "upon the death of a decedent, a one-half share of the community property shall be confirmed to the surviving spouse," RCW 11.02.070, Patricia argues that "it must be presumed that because Walter and Patricia specifically agreed that their property would become community property, they intended for the surviving spouse to take half of the combined assets directly." Br. of Resp't at 30-31.

This argument fails. Initially, it disregards the election doctrine, discussed above, "that one who takes under a will must conform to all its provisions, and if he accepts a benefit thereunder, he must renounce every right inconsistent therewith." *Nadham*, 14 Wn.2d at 596-97. Thus, however the Agreement characterized the combined property, Patricia had to accept the

22

trust provisions and distribution formula of the Agreement, along with the community property provision.

Perhaps more to the point, the bedrock intent animating the Agreement and mutual wills, as shown above, was that the couple's combined assets, however held or characterized, would ultimately be distributed to the children according to the formula specified. As also shown above, giving Patricia outright ownership and full control over one half of the entire estate based on the recharacterization to community property would require us to read the Agreement and wills to generate wildly diverging distributions to the children depending on who died first. Such an absurdity would contradict all objective signs of the couple's intent. Because Patricia took assets under the will, she did so subject to the Agreement's provisions for ultimate distribution of all the combined assets to the couple's respective children.

The record makes clear that Patricia's inter vivos gifts amount to an attempt to evade the distribution formula specified in the Agreement. The majority of courts facing similar circumstances have held that inter vivos gifts made to avoid obligations under mutual wills are improper:

> Regardless of the wording of a joint or mutual will, or the accompanying agreement, if property is left to third-party beneficiaries who are to take upon the death of the survivor, most courts consider any inter vivos transfer made by the survivor with an intent to avoid the agreement, to be improper.

85 A.L.R.3d 8 § 21, at 59 (originally published in 1978) (compiling cases).

In *Newell v. Ayers*, 23 Wn. App. 767, 768-69, 598 P.2d 3 (1979), we reached the same result under facts very similar to those here: a surviving spouse who had entered into a mutual will agreement made substantial inter vivos gifts to his daughter, her husband, and their descendants, thereby avoiding his obligation to devise much of his property to his deceased

wife's children from a prior marriage. We held that "[s]ince the evidence also discloses that the decedent's inter vivos transfers were in effect testamentary dispositions contrary to the disposition called for by the agreement, those transfers were void and were properly set aside," noting that "[o]nce the survivor elects to take under the provisions of such a will, he is not free to avoid the obligation to dispose of his property as previously agreed." *Newell*, 23 Wn. App. at 769-70.

In *Newell*, 23 Wn. App. at 770, we relied on *Olsen v. Olsen*, in which a New York court considering a similar case held:

> [A]ll property held by [the wife], by [the husband], by them jointly, or by either in trust for the other, was embraced in the agreement, for the parties provided therein for the disposition of "our property." This term would include the property of either as well as the property which they held together.
>
> Of course when [the wife] died [the husband] acquired the joint property for himself, bound, however, by the terms of their common agreement. Moreover, while [the husband] had the right to use as much of the assets of their joint estates during his lifetime as he required, he did not have the right to "make a gift in the nature, or in lieu, of a testamentary disposition or to defeat the purpose of the agreement."

189 Misc. 1046, 1052, 70 N.Y.S.2d 838 (Sup. Ct. 1947) (quoting *Rastetter v. Hoenninger*, 214 N.Y. 66, 74, 108 N.E. 210 (1915)). The language of the will at issue here is even clearer: it creates "a specific plan for ultimate distribution of all of our combined property." CP at 302.

Patricia seeks to distinguish *Newell* and *Olsen* on the ground that the surviving spouses in those cases sought to give away more than half of the community property and leave the deceased spouse's chosen devisees with nothing or almost nothing, while Patricia has given away only a portion of the community property confirmed to her, leaving substantial assets in the trust for Pauline's inheritance. These differences, however, played no role in those courts' analyses. *Newell*, 23 Wn. App. at 770-72; *Olsen*, 70 N.Y.S.2d at 842-44.

We adhere to our decision in *Newell*, which is directly on point and controls the outcome

24

here. Patricia's decision to fund the trust with only half of her and Walter's combined assets, as well as her subsequent gifts of a substantial portion of those assets to her own chosen devisees, amounts to an attempt to avoid the distribution formula to which she consented under the Agreement and mutual wills.

Under the terms of the Agreement and mutual wills, Patricia may draw on the trust for her maintenance, as described above, and may dispose of a share of the combined assets equal to "her percentage of relative ownership as . . . she chooses," including, presumably, by inter vivos gift. CP at 282. To remain consistent with the Agreement and wills, however, any such gift must necessarily reduce the devise that ultimately passes to Patricia's daughters upon her death through her percentage of relative ownership.

With respect to the Forsberg-Fisher property, we hold the gifts void. Walter had testamentary power over that property, which he held as separate property prior to his death. It should thus have formed part of the trust corpus, which the trustee could distribute only if the trust income, after due consideration of other resources available to Patricia, proved insufficient "to provide for her health, support and maintenance in her accustomed manner of living." CP at 306.

The cash gifts are less problematic because, at the time of Walter's death, Patricia held as her separate property liquid assets well in excess of the amounts given. So long as they ultimately reduce the amount passing to the daughters of Patricia's first marriage, the cash gifts are not plainly inconsistent with the Agreement and mutual wills. That is, the cash gifts may qualify as a proper exercise of Patricia's power to dispose of her percentage of relative ownership under the Agreement and mutual wills. We leave it to the sound discretion of the trial court to determine the propriety of these gifts on remand.

25

IV. ATTORNEY FEES

Pauline contends that this court should reverse the trial court's award of attorney fees to Patricia, noting that the court failed to enter findings of fact and conclusions of law and arguing that this court thus does not have an adequate record upon which to review the award. Pauline further contends that the trial court erred in denying her fee request.

The relevant fee shifting provision provides:

> Either the superior court or any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party: (a) From any party to the proceedings; (b) from the assets of the estate or trust involved in the proceedings; or (c) from any nonprobate asset that is the subject of the proceedings. The court may order the costs, including reasonable attorneys' fees, to be paid in such amount and in such manner as the court determines to be equitable. In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation benefits the estate or trust involved.

RCW 11.96A.150(1). Because we hold that Patricia improperly attempted to avoid her obligations under the Agreement and mutual wills, thereby requiring Pauline to initiate this action to enforce her rights, we reverse the trial court's fee award. We leave it to the trial court to determine whether to award fees to Pauline on remand.

Both Pauline and Patricia also request fees on appeal, citing RCW 11.96A.150(1). Under RAP 18.1(a), we may grant attorney's fees on appeal if authorized by applicable law. Because Pauline prevails, and because Patricia's improper actions forced Pauline to litigate this appeal, we grant Pauline's request under RCW 11.96A.150(1). For the same reasons, we deny Patricia's request for fees on appeal.

CONCLUSION

We reverse the trial court's grant of summary judgment to Patricia. We remand for entry of partial summary judgment in favor of Pauline setting aside the transfer of the Forsberg-Fisher

property to Patricia's daughters and sons-in-law and enjoining Patricia from further gifts inconsistent with the Agreement and mutual wills as interpreted in this opinion, and for further consideration, consistently with this opinion, of Pauline's other claims. We also reverse the trial court's attorney fee award to Patricia and grant Pauline's request for fees on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

BJORGEN, J.

We concur:

JOHANSON, C.J.

SUTTON, J.